UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

IN RE: MASTER LENDING GROUP, )
LLC, )
) CHAPTER 7
Debtor, ) CASE NO. 23-40569
______________________________)

MOTIONS HEARING
BEFORE THE HONORABLE EDWARD J. COLEMAN, III
WEDNESDAY, NOVEMBER 8, 2023; 2:49 P.M.

APPEARANCES:

| | |
|---|---|
| Trustee: | Tiffany Caron, Esq.<br>Post Office Box 711<br>West Palm Beach, FL 33402<br>(404)647-4917 |
| For the Trustee: | Neil C. Gordon, Esq.<br>Taylor English Duma, LLP<br>1600 Parkwood Circle SE<br>Suite 200<br>Atlanta, GA 30339<br>(770)434-6868 |
| For Debtor: | Judson C. Hill, Esq.<br>Gastin & Hill<br>1020 Drayton Street, Suite 201<br>Savannah, GA 31401<br>(912)232-0203 |
| For U.S. Trustee: | Joel Paschke, Esq.<br>U.S. Department of Justice<br>441 G. Street, NW, Suite 6150<br>Washington, DC 20530<br>(202)307-1391 |

For the Estate of Gregory Hirsch: James F. Banter, Esq.
Susan Elizabeth Hall, Esq.
James Bates Brannan Groover, LLP
231 Riverside Drive
Macon, GA 31201
(478)749-4280

For Judith Hirsch: Leon S. Jones, Esq.
Jones & Walden, LLC
699 Piedmont Avenue, NE
Atlanta, GA 30308
(404)564-9300

For Hirsch & Tucker: Robert M. Brennan, Esq.
Parker, Hudson, Rainer & Dobbs
303 Peachtree St. NE, Suite 3600
Atlanta, GA 30308
(404)681-5969

INDEX


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Steven Gregory Hays, | | | | |
| By Mr. Gordon | 29 | | | |
| By Mr. Jones | | 91 | | |
| By Mr. Banter | | 99 | | |
| Thomas J. Ratcliffe, | | | | |
| By Mr. Gordon | | 105 | | 134 |
| By Mr. Banter | | 129 | | |
| Judson C. Hill, | | | | |
| By Mr. Gordon | 155 | | 171,175 | |
| By Mr. Banter | | 162 | | |
| By Mr. Jones | | 167 | | 172 |

TRUSTEE'S EXHIBITS

| NO. | IDENTIFICATION | EVD. |
|---|---|---|
| 1 | 7/21/23 letter | * |
| 4A | Pre-petition email pg.4 | 182 |
| 5 | Operating Declaration | * |
| 7 | List of life insurance policies | * |
| 9 | MLG Retainer agreement | 172 |
| 11 | MLG retainer check | 172 |
| 12 | CV of Greg Hays | 81 |
| 14 | MLG investments spreadsheet | 81 |
| 15 | List of search terms | 81 |
| 16 | Checks to/from Hirschs/entities | 81 |
| 17 | 10 Whitaker Loan modification | 81 |
| 18 | Hirsch, et al transactions | 81 |
| 19 | Hirsch memo on Rison Load | 81 |
| 20 | List of known bank accounts | 81 |
| 21 | MLG funds tracing summary | 81 |
| 22 | Quit Claim deed | 81 |
| 23 | McCorkle & Johnson waiver letter | 81 |
| 24 | Research transactions | 81 |
| 25 | Synergy payment analysis | 81 |


* These exhibits were agreed upon by the parties as admitted.

(Call to Order at 2:49 p.m.)

THE COURT: Good afternoon, everybody.

(Group responds simultaneously.)

THE COURT: All right. We are here on the case of Master Lending Group, LLC. This is Case No. 23-40569. Let me begin by asking counsel to come to the podium and announce your appearance in alphabetical order. Just kidding.

MR. GORDON: I don't even know everybody who is here. Your Honor, Neil Gordon and Tiffany Caron are here for the bankruptcy estate and the Chapter 7 Trustee.

MR. HILL: Judson Hill, Your Honor, in my capacity as the attorney for the debtor and then also for myself as far as being the movant on the motion for relief -- I meant motion to withdraw.

THE COURT: Yes, sir. Thank you.

MR. PASCHKE: Joel Paschke appearing for the U.S. Trustee, Your Honor.

MR. BANTER: Good afternoon, Judge. James Banter and Elizabeth Hall on behalf of the estate of Gregory Hirsch.

THE COURT: Thank you, Mr. Banter.

MR. JONES: Good afternoon, Your Honor. Leon Jones on behalf of Judy Hirsch.

THE COURT: Is that everybody?

Mr. Mills, you're here with Mr. Paschke?

MR. MILLS: No, Your Honor. The item I was here for

today -- the item for today -- my objection related to the fee application of Mr. Hill.

THE COURT: Okay.

MR. MILLS: He has withdrawn that fee application.

THE COURT: Okay.

MR. MILLS: So I'm -- I don't intend to say anything today.

THE COURT: All right. Very good. Thank you.

Anybody else? All right. Very good. All right. So, first of all, it may occur to one or more of you that it didn't make much sense to schedule for 2 o'clock so much work. There was no method to my madness -- just madness. It is now nearly 3 o'clock, but a lot of people have traveled a long way and so I want to make as much use of our time today as I can.

Let me refer to a few matters on the docket that I think are -- can be dealt with. As Mr. Mills just pointed out there was on the docket at Docket Numbers 108 and 120 the amended applications for allowance of interim compensation filed by Mr. Hill on behalf of Master Lending Group, LLC which drew an objection by the U.S. Trustee at Docket 172 and an objection by the Chapter 7 Trustee at Docket 173. Those -- both of those applications have been withdrawn without prejudice by Mr. Hill and so all of those matters are moot for purposes of today.

Mr. Hill, you have filed a motion to withdraw as

attorney for the debtor. That appears at Docket 166. To your knowledge, has new counsel for the debtor made an appearance?

MR. HILL: No, sir.

THE COURT: All right. Anybody here have any information on new counsel for Master Lending? Okay.

The Court has reviewed your application and, quite honestly, I think because of some of the issues that have arisen your withdrawal is more than appropriate and so the Court intends to grant that. I've reviewed the local rule for withdrawal and I find that you have satisfied the requirements of that. So I'll enter an order granting that.

MR. HILL: Thank you, Judge.

THE COURT: That, of course, doesn't answer the question of your status -- your attorney-client status to either Mrs. Hirsch or the debtor. We'll address that later --

MR. HILL: Understood.

THE COURT: -- but I am granting your application to withdraw from this case.

MR. HILL: Thank you.

THE COURT: But I hope you won't withdraw from the room just yet.

MR. HILL: No, sir. I am not going anywhere 'til the lights are off.

THE COURT: Yes, sir. All right. By way of the various discovery issues that have arisen in this case, we have

on the calendar numerous motions, Rule 2004 examination, subpoenas, limited objections, et cetera, and I know that a number of these objects of discovery are a subject of discovery represented by counsel. Is there any announcement of any partial resolution of any of those issues?

MR. BANTER: Your Honor, yes. James Banter, again, on behalf of the Gregory Hirsch estate and we are able to announce a resolution we've reached working with the Chapter 7 Trustee and, again, if you recall the last time we were here our main plea to the court was to look at the scope of the discovery they were seeking that the scope of 2004s were seeking to expand the scope to items and entities we believe were outside of the scope of 2004; specifically, related to entities or, actually, Greg Hirsch personally and what we asked to do and what we've been working with the U.S. Trustee is we've asked to see the evidence of where if there are any transfers to and from the debtor entity to the entities they want to go after in 2004 are Greg Hirsch personally, we will allow that if they can identify the specific accounts where those funds went to and what they've done and what we've seen now is we've seen checks and evidence in the Chapter 7 for select entities and individual bank account and where those bank accounts have been identified we're no longer going to object to those bank accounts.

Practically, what that means is the Truist 2004

objection we objected to I believe that would allow several -- at least four entities, a Hirsch and Company, a Low Country Development, a Wallen Street and a Gregory Hirsch account. Again, those specific accounts -- we would not object to them getting that information. They've also since withdrawn the 2004 -- a motion for 2004 for entities such as the Riddles and the Robertsons and also Workman's Circle Credit Union and those have now been withdrawn. So, therefore, our objections would now be moot.

THE COURT: All right. And those withdrawals are, of course, without prejudice. I mean, it may develop that they need to go back and look at that; right?

MR. BANTER: Yes, Your Honor, and that next step back what we have told them what we want to work with them is if, again, they can identify funds going to and from to a specific account, we'd like to discuss with them that and we would not be objecting to those accounts they've identified. We would still have an objection if any of the U.S. Trustee or the Chapter 7 is seeking any and all information because we would contend that's outside of the scope of 2004 as relates to the debtor.

THE COURT: All right. So are you and Trustee's counsel in a position to submit some form of consent order that sort of covers what you've agreed upon?

MR. BANTER: With the Chapter 7, Your Honor, what I

would propose -- and we've discussed it before the hearing -- maybe a limited time to work together to memorialize a order that encompasses what we're discussing here. We had previously submitted an interim order to govern the interim period between the previous hearing 'til now. That wasn't a consent order at any means, but I do think we have a process and a framework to move forward now and, hopefully, we can do that within the next week if we could work that out to the process we've identified with those accounts.

THE COURT: Ms. Caron?

MS. CARON: Your Honor, I agree with what Mr. Banter is saying with regard to the bank accounts that we've identified. What I would like -- it's more of a question for him.

Does that fully resolve your objection to the motion for 2004 exam on Trust and on Hirsch and Tucker?

MR. BANTER: If I may add, Your Honor?

THE COURT: Yes.

MR. BANTER: For Hirsch & Tucker, the Chapter 7 did exchange search terms, I believe, Friday that they've been applying to the Hirsch & Tucker email account that Greg Hirsch had there. We have no objections to those search terms. What we would like to work out moving forward, again, is just that we have access to the information and an opportunity to review it further, but we don't have an objection to the search terms

they developed to apply to that email account which I think they have applied and they've started looking at. We don't have any objection to that.

To answer the question, again, to the specific accounts identified, we do not have an objection there. If there is any further scope of any and all, we would have objection to that. I don't think that's what we've heard so far. Again, from the Chapter 7 is they want to move forward with those accounts and we want them to proceed with that.

THE COURT: All right. So maybe this would be helpful to counsel just kind of in broad strokes. I don't expect to resolve most or even very many discovery disputes today. I want to try to give counsel some direction. In my 30,000-foot view of the case is, you know, so far we got creditors that have filed 40-plus million dollars in claims. I've looked at a lot of them. A lot of them have nothing more than a promissory note. A few have some miscellaneous attachments, emails, or whatever -- not a lot of information there. So we got -- we got $40 million of creditors and if we look at the schedules at least as amended -- perhaps, improperly -- there's, you know, very few assets or not enough assets to recover.

So, you know, the question I have and, presumably, the Trustee has, is where did the $40 million go, and my philosophy is I am going to do everything possible to allow that inquiry to be pursued in every avenue that is available.

So one thing for all the lawyers in the room to think about is, you know, every fight you have over a document, you know, keep track of your time. Bill your client and, you know, just keep in mind at the end of the day the client might want to know why did you fight so hard on something and lose. We're just -- we're looking for the money and if the Trustee can't find any money, then that may be the end of the discussion.

So we have a request to have a number of examinations broadly. I would allow the Trustee to examine -- at least show up with a court reporter, swear in a witness, and start an examination, but I have no idea what questions are going to be asked. So I can't -- I can't determine in advance the areas of inquiry.

For example, let's say I think the accounting firm of Hirsch & Tucker was someone that you wanted to examine; right, Ms. Caron?

MS. CARON: Yes, Your Honor.

THE COURT: Well, if I am Mr. Tucker, presuming that he is the remaining surviving partner of that entity, you know, my antennae are way up. You know, I am trying to protect my clients, many of whom don't have anything to do with this case. Most of them, I assume, don't have anything to do with this case, but he and his lawyers are going to be very sensitive to the areas of inquiry, but I assume the Trustee would want to know for one thing did that accounting firm represent the

debtor ever and if it did, then all the work papers, all the communications relating to that accounting firm's work for this debtor feels like it's fair game.

When -- you know, when counsel starts examining Mr. Tucker, for example -- there may be other principals in that firm that I'm unaware of -- and asks about a particular client that is, you know, has nothing to do with this case, I would expect an objection to be raised and then that gets tabled and then we come back for, you know, another hearing and you present to the court, "Well, we got so far. We got these documents. Now we got these more discrete specific discovery questions that the court needs to answer and then we can go through it that way."

We're not going to be able to write a formula today that gives everybody a game plan on how to go forward because one thing that will happen inevitably is a document will get revealed in discovery and that will lead to another path of discovery and so on. So I want counsel to realize we're not going to answer all the questions today, but I am encouraged by the idea that you've come to some agreement on how, you know, that process might start. So maybe one way to look at this is to talk about the examinations that have been proposed so far.

So we have a motion to examine Hirsch & Tucker, LLC; is that correct?

MS. CARON: Yes, Your Honor.

THE COURT: With related document production?

MS. CARON: Yes, Your Honor.

THE COURT: All right. So is counsel for Hirsch & Tucker present?

MR. BRENNAN: I am, Your Honor. Robert Brennan with Parker Hudson. I represent Hirsch & Tucker.

THE COURT: Robert Brannon?

MR. BRENNAN: Brennan. B-R-E-N-N-A-N.

THE COURT: Yes, sir. So just by way of example, do you agree with me that an examination of your client can at least start with, you know, the court reporter and cups of coffee and whatever else you serve at your depositions and then when you get to the point where "well, we object" and we can come back here and discuss it; right?

MR. BRENNAN: I do, Your Honor.

THE COURT: Do you have any sense of whether Hirsch & Tucker represented the debtor in this case?

MR. BRENNAN: I do not believe they did, Your Honor. They didn't prepare taxes for Hirsch & Tucker -- I mean for Master Lending Group. Mr. Tucker, the surviving member of Hirsch & Tucker, was not involved in Master Lending Group as an investor. He wasn't -- didn't do any work for Master Lending Group. That was Mr. Hirsch's entity.

THE COURT: All right. Well, I hear you. So we'll let counsel figure out, you know, what accounting firm, if any,

did represent ---

MR. BRENNAN: And, Your Honor, we have been cooperating with Mr. Gordon, Mr. Hays, Ms. Caron. We've had calls. We've uploaded documents, emails, gathered documents and emails all so that they can do exactly what you said -- find the money.

THE COURT: Okay. Very good. All right. And so there is in that proposed examination of the accounting firm of Hirsch & Tucker. Then we have an examination of Workman's Circle and that's been withdrawn without prejudice?

MS. CARON: Yes, Your Honor. Workman's Circle provided a number of documents and we reviewed the documents. We haven't asked for an actual examination where we're conducting a 2004 examination of any officer at the bank. We wanted to see the documents. We believe that they have provided all the documents that we've requested and that's why the motion was withdrawn.

THE COURT: All right. So just looking at my calendar then Docket 58 and 74 are a motion for examination and document production of Workman's Circle. Document 103 is a limited objection to that filed by Mr. Banter.

All right. Mr. Banter, you filed a limited objection on behalf of the estate, not on behalf of Workman's Circle; right?

MR. BANTER: That's correct, Your Honor.

THE COURT: Does anybody represent Workman's Circle Credit Union?

MS. CARON: Jim Drake does, Your Honor.

THE COURT: He is not with us today and so is he going to be -- all right.

You've withdrawn that motion, though; right?

MS. CARON: Yes, Your Honor.

THE COURT: All right. And so that resolves a big chunk of my calendar here. All right. Then we had an examination of a motion for Rule 2004 examination of William Wilson Riddle, Jr.; is that correct?

MS. CARON: Yes, Your Honor.

THE COURT: And you've withdrawn that without prejudice?

MS. CARON: Yes, Your Honor.

THE COURT: And who is here on behalf of Mr. Riddle?

MS. CARON: No one, Your Honor.

THE COURT: Do you know who represents Mr. Riddle?

MS. CARON: I am not aware that Mr. Riddle has an attorney. We've been speaking with him directly.

THE COURT: All right. And is this a party that had something to do with a real estate investment?

MS. CARON: No, Your Honor. On the bankruptcy schedules on Schedule AB there is a listing for about $16 million owed to the debtor from Mr. Riddle and it was a

healthcare company out of Texas.

THE COURT: Right.

MS. CARON: We have determined from the bank statements and the debtor's records that that money was repaid to the debtor.

THE COURT: Okay. You followed that money into a bank account?

MS. CARON: Yes, Your Honor. The MLG account.

THE WITNESS: Okay.

MS. CARON: Master Lending Group, Your Honor.

THE COURT: All right. So ---

MR. GORDON: Many years ago.

MS. CARON: Many years ago.

THE COURT: All right. So you're withdrawing, I presume without prejudice, the motions reflected at Documents 59, 75 which would resolve for today's purposes Docket 103, the limited objection by Mr. Banter?

MS. CARON: Yes, Your Honor, and it is the same -- Ms. Robin DeeAnn Riddle Robertson is the former spouse of William Wilson Riddle and we were asking for the same documentation from her.

THE COURT: All right. And so that would resolve as to Ms. Robin Robertson Docket 60, 76, 103 and, of course, your withdrawal of Document No. 60 is reflected at 177. All right. Then as to Truist Bank that is the area of inquiry -- the

examination and document production where I can get some sort of consent order at least to get us started somewhere?

MS. CARON: On the Chapter 7 Trustee's motion, I am still not clear whether when you provide those documents that resolves your objections to the motion 2004 exam.

MR. BANTER: So the Rule 2004 examination is on Truist. We objected in standing on behalf of Greg Hirsch who had accounts there and what we've done -- again, my understanding of the agreement is we are withdrawing the objection to the extent Truist should now be able to produce bank records for select accounts that we've identified together based on those accounts received funding to and from Master Lending Group. To the extent any other accounts are being sought for information, then we would object to those. I don't think any of us are aware of any of those accounts at this time.

THE COURT: All right. But, so, do any of the accounts that you agree are discoverable -- are there any co-owners or are they accounts of entities that Mr. Hirsch controlled?

MR. BANTER: So there are -- I think there are three buckets. There is at least one from Gregory Hirsch that's been identified to receive funds. We allowed that to move forward. There is accounts for entities such as Hirsch and Company, Low Country Development, Wallen Street, LLC. These are entities

that based on our best information we believe Greg Hirsch was a sole member or at least had some membership in and, again, what we would be saying is we are now withdrawing any objection Greg Hirsch would have had to those entities -- those accounts being sought after.

THE COURT: All right. So and are you withdrawing it on the theory that Ms. Caron's waiver of attorney-client privilege allows you to do so or ---

MR. BANTER: No, Your Honor. We're ---

THE COURT: -- you just think they're discoverable?

MR. BANTER: We're saying that they are now discoverable based on the scope of 2004 examination. They have shown the evidence of why it is related to the debtor. That's why our objection was in the beginning is we did not see how these entities are related to the debtor. They have now shared that information. We are now going to withdraw our objection for that purpose.

MS. CARON: Your Honor, we provided a number of checks from the Master Lending Group account that showed money going from Master Lending Group to Greg Hirsch, to Wallen, to Hirsch and Company, to Low Country, and those checks were provided to Mr. Banter.

THE COURT: All right. So on my calendar what I'm looking at is Docket 63 and 78. 63 is a motion for Rule 2004 examination of Truist by Ms. Caron, not by the U.S. Trustee.

MS. CARON: Yes, Your Honor.

THE COURT: And so you have negotiated, Mr. Banter, some language or you'll continue to negotiate some language that will allow you to move forward one step at a time, so to speak; right?

MR. BANTER: Right. Yes, Your Honor.

THE COURT: All right. And so that -- for purposes of organizing my thoughts, that would resolve for today Docket 63, 78, 103 and then that takes us to Docket 79, Mr. Paschke, which is your -- which is the U.S. Trustee's motion for examination of -- I am not sure who it's ---

MR. PASCHKE: It is Truist, Your Honor. Truist Bank formerly Suntrust.

THE COURT: Okay. All right. And have you had similar discussions with Mr. Banter?

MR. PASCHKE: Only briefly, Your Honor. For the most part the U.S. Trustee's position hasn't really changed. The UST's position is that we have met our burden to show good cause exists and we're about to propose the proposed Rule 2004 examination and production of documents of Truist Bank. We have submitted evidence at the September 12 hearing showing that MLG sent money via check to both Greg Hirsch individually as well as a number of his wholly-owned and controlled business entities.

Furthermore, we are concerned that not all of the

$40 million and change in terms of money raised from investors who are now creditors in the MLG case ever flowed through MLG's bank account at Truist Bank and because of that concern we believe that we should be casting a wide net to look for that money wherever it is most likely to be found, mainly bank accounts where Gregory Hirsch could have hidden it, and that's why we are not looking to have our inquiry limited. Respectfully, Your Honor, we don't have any more evidence to put into the record today; although, I do understand the Chapter 7 Trustee and counsel will be submitting some additional evidence.

THE COURT: Right.

MR. PASCHKE: Our position is that to the extent that the new evidence also is relevant to the U.S. Trustee's Rule 2004 motion involving Truist Bank that the Court consider that in addition to the evidence that we filed on September 12.

THE COURT: All right. So, Mr. Paschke, here's my idea. I recall our spirited exchange at the last hearing and I think you had the best of it, but, respectfully, what I think I'll do is let the discovery in your favor proceed initially along the same lines as what Ms. Caron gives a concession on without prejudicing your position to get more. My hope is that the initial -- and this could just be naivety on my part, but my hope is that some of the initial discovery will provide clues, you know, to the next step by way of endorsements on the

back of some of the documents, notes in the memo section. I mean, who knows?

I'm just -- I'm just hoping that there will be that trail, but I'm not -- I'm not foreclosing the idea that you are right that I should allow discovery of anything Hirsch had control over no matter who else could touch it: Children, spouses, other entities. So I'm just going to kind of put you on a back burner for today, but do you understand what I am saying?

MR. PASCHKE: My understanding is that we would be allowed to proceed only with regard to accounts at Truist Bank that have been identified as recipients of checks from MLG; is that correct?

THE COURT: Is that, Mr. Banter, what you and Ms. Caron have tentatively agreed to?

MR. BANTER: Yes, Your Honor, and I would add that we would offer the same to the U.S. Trustee that they should be allowed to get the same information as the Chapter 7. Again, our framework is where the checks are to and from, those accounts that have been identified we have no objection, and we would be compliant that both are treated the same and have access to the same information at this time.

THE COURT: Now there was some discussion at our last hearing about this idea that a motion for Rule 2004 examination kind of belongs to the lawyer that filed it and, you know,

nobody else can show up, Mr. Paschke. So I guess my question for you is do you have any objection to you and Ms. Caron sitting at the same table and asking questions in turn at a sort of a joint Rule 2004?

MR. PASCHKE: Well, we hadn't discussed, you know, having a joint 2004 exam, Your Honor.

THE COURT: I mean, we can do two. It seems a little inefficient because you wouldn't have the benefit of knowing what she asked and what was answered whereas if you both sat there -- I mean, I don't know if that's permitted under Rule 2004 case law or not.

MR. GORDON: Your Honor, Neil Gordon. From the standpoint of Chapter 7 Trustee, we, of course, have been supportive of the U.S. Trustee's motion. This is done in a way as not to too much overlap each other to save costs and so the records that they obtained through our discovery were going to be shared with the estate and we were going to do likewise and I think that it should go forward that way mutually because it will save the estate money in the long run, and, also, and I want to mention this to Your Honor because I don't know if it's been made clear, it was believed at the last hearing which I was not at but from what I understood that the Court wanted to, essentially, get a report from the forensic -- on the forensic side about this case and Greg Hays is here who is employed in that capacity and would probably give about a 30-minute report

that would be, I think, helpful to the Court and everyone else in connection with this case.

He's done a tremendous amount of work already and I think that it would be beneficial to everybody in the courtroom as well as the Court, but if there is no time for it, I understand that, but we were actually going to present it even for the U.S. Trustee's motion because we support that, also, because, ultimately, that's going to -- the information that goes to the U.S. Trustee is going to benefit the Chapter 7 Trustee and save us a lot of time and if the Court is willing to hear it, it will take about 30 minutes.

THE COURT: I definitely -- I definitely want to hear it. It might -- it might help all the parties figure out, you know, the scope of overall discovery and where this thing is going.

So I would be happy to do that, but, Mr. Paschke, am I stepping on your toes? If you want a private Rule 2004, I mean, I'll let you have it, but it seems a little ---

MR. PASCHKE: I mean, I don't have a problem coordinating a joint 2004 examination. If that's desirable to the Chapter 7 Trustee, that would be fine with us. My only concern at the outset was to make sure that we have a clean transcript of whatever the testimony is at the time.

THE COURT: Have a complete transcript?

MR. PASCHKE: A clean transcript that, you know, it's

always -- it's always clear from the transcript who is asking the question and who is answering and so forth.

THE COURT: Okay.

MR. PASCHKE: Sometimes that gets complicated when you have more than one person asking questions.

THE COURT: So you're not alluding to how fast Mr. Gordon speaks; right?

MR. PASCHKE: No.

MR. GORDON: He doesn't know me that well yet, but it doesn't take long. Really, I think it could just be stated on the outset of the record that -- and with the Court's permission -- that both the Chapter 7 Trustee and the U.S. Trustee can ask questions at the same proceeding. I mean, that's how I've done it at other times.

THE COURT: Well, my recommendation would be that you kind of have a game plan ahead of time so you don't cover the same material, but there may be issues that are more important to the U.S. Trustee from a legal standpoint. I don't know, but ---

MR. GORDON: It's ---

THE COURT: I'm confident you can work that out.

MR. GORDON: We can.

THE COURT: And everybody knows that a transcript is only as useful as the Court's ability to decipher it.

MR. GORDON: It mostly has to do with cross

examination if, say, the U.S. Trustee is finished cross examining and we think there is a few more questions that need to be asked, then we just follow up a few more questions. It is really not more than that.

THE COURT: Well, I am going to be extremely liberal on the way you do it. My sole interest is getting to the bottom of this mystery and so.

MR. PASCHKE: Okay, Your Honor.

THE WITNESS: I'm confident y'all can work that out.

MR. PASCHKE: If you want us to submit a proposed joint order, we can do that.

THE COURT: All right. That's fine.

MR. PASCHKE: Sound good, Neil?

THE COURT: All right. Thank y'all.

All right. So working through our items on our calendar, so on the examination -- I don't know why they marked this off, but on the examination of Hirsch & Tucker has there been any discussion, Mr. Brennan, about any sort of limitation on how that would proceed?

MR. BRENNAN: Not as of yet, Your Honor. Hirsch & Tucker's main concern is, of course, the confidentiality of its clients' tax records and we've had discussions about reviewing documents prior to them being produced to designate client tax records that may have been on Mr. Hirsch's hard drive or maybe contained within emails of Mr. Hirsch's Hirsch & Tucker email

account.

THE COURT: All right. Well, I think I probably expressed some incredulity that all the financial reporting of this debtor entity somehow ended up just in a Schedule C of Mr. Hirsch. That sounds bizarre and extreme. Years ago somebody told me that you're less likely to be audited if on your 1040 there is the name of an accounting firm versus, you know, taxes done by Edward J. Coleman, III. I don't know if there is any truth to that, but I would be curious if, Mr. Gordon, you or Ms. Caron had seen any of Mr. Hirsch's tax returns. Do you have any basis to know whether the debtor was a client of the accounting firm?

MS. CARON: Your Honor, we haven't seen any of Mr. Hirsch's personal tax returns, just the two pages of the Schedule C for Master Lending Group.

THE COURT: Okay. So has a request for his personal tax returns been pursued from anybody?

MR. HILL: Your Honor, I can speak to that. We provided -- I provided copies of the entire personal tax returns for Mr. Hirsch including the relevant Schedule C just to the Trustee early on in the case.

MS. CARON: What? The entire personal income tax return?

MR. HILL: Yes.

MS. CARON: I don't -- I would need to see a copy of

that again. I have never seen that.

THE COURT: Did you keep a copy of everything?

MR. HILL: Yes.

THE COURT: Okay. Well, then to the extent that you need an additional, then Mr. Hill will be glad to give you one; right?

MR. HILL: Absolutely.

THE COURT: Okay. Do you have it with you?

MR. HILL: No, sir.

THE COURT: Okay. All right. Anyway -- all right. So, Ms. Caron ---

MS. CARON: Your Honor, I am so sorry. I am just so shocked.

MR. HILL: Your Honor, I can call my office right now and get a copy.

THE COURT: I'm sure the documents will get exchanged, but, Ms. Caron, are you confident you can at least get the examination of Hirsch & Tucker started and it may -- this may be one where you have to -- it's better to wait because you don't have a good connection between the debtor and that accounting firm. It would surprise me if Mr. Hirsch segregated that completely, but you got to have -- you got to be able to give Mr. Brennan some reason to have your foot in the door of the accounting firm; right?

MS. CARON: Your Honor, Mr. Hays is here and he has

been working with Mr. Brennan on uploading documents to a program called Relativity which is a document review -- it is a document review website where you can give access to users and then they can go through and review documents. We just started getting those and those are being reviewed based on key words that Mr. Hays provided to Mr. Brennan.

MR. GORDON: Mr. Hays can talk about that when he is on the stand --

THE COURT: All right.

MR. GORDON: -- and he can go into more detail --

MS. CARON: That's fine.

MR. GORDON: -- so we don't duplicate it now.

THE COURT: All right. All right. So Hirsch & Tucker is going to have a similar resolution to what we've been talking about with Truist. All right, well, if no one has an objection, why don't we hear from Mr. Hays in support of these various discovery issues?

Mr. Hays, you need to be sworn in.

(Steven Gregory Hays is duly sworn.)

MR. GORDON: If I may, Your Honor, these are the exhibits that he is going to be referring to and Your Honor should have a set of these, also. If I could just approach Mr. Hays, it is easier to do it this way than for me to keep bouncing up for each exhibit.

THE COURT: Okay.

**DIRECT EXAMINATION**

BY MR. GORDON:

Q Mr. Hays, please state your name for the record and spell it for the Court.

A Steven Gregory Hays -- H-A-Y-S.

Q And what is your occupation?

A I have a forensic accounting firm called Hays Financial Consulting that I formed 23 years ago and I have a forensic accounting group. I served as a bankruptcy Trustee. I am on the Chapter 7 panel in Atlanta. I am a federal receiver and Chapter 11 Trustee.

Q And, approximately, how many cases as receiver or a Trustee or on behalf of receivers or trustees have you been involved with that were either Ponzi schemes or investor fraud cases?

A Well, on my CV I list 27 different cases that were Ponzi schemes or Ponzi scheme related where I was either a Trustee, a receiver, or an expert witness.

MR. GORDON: Now, Your Honor, I can go through the 35-page CV that he has or I'd like to be able to stipulate him as quickly as possible to save time as an expert.

THE COURT: You're a lawyer?

THE WITNESS: I'm not, Your Honor.

THE COURT: Okay. A CPA?

THE WITNESS: No.

THE COURT: Okay. What sort of certifications does a

forensic accountant get?

THE WITNESS: I'm a Certified Insolvency and Restructuring Adviser and I've been on the board of the AIRA which is the Association of Insolvency and Restructuring Advisers for about 15 years. I'm also a Certified Turnaround Professional and I have been active in that group for about 20 years.

Q And you've served as president of the National Association of Federal Equity Receivers?

A I helped form the National Association of Federal Equity Receivers about 10 years ago and on the board present of that organization for two years -- still on the board with that group. Those are the top -- the people that are members of that organization are the top lawyers and consultants in the country that manage and liquidate Ponzi scheme type cases.

THE COURT: All right. And have you appeared as an expert witness in federal court?

THE WITNESS: I have.

THE COURT: How many times?

THE WITNESS: I am trying to think whether it was federal or state. I have been an expert witness about less than 10.

THE COURT: Okay. In federal court?

THE WITNESS: I have been a receiver in federal court. I am in state court right now on a Ponzi scheme case. Most of

those are state court cases.

THE COURT: Okay. But you've been qualified as an expert by those courts?

THE WITNESS: Right. Yes, sir, Your Honor.

THE COURT: Anyone have any objection to the court accepting Mr. Hays as an expert in the area of forensic accounting?

MR. BANTER: No objection, Your Honor.

THE COURT: Anyone wish to voir dire him on that issue?

All right. Go ahead, Mr. Gordon. I'll accept Mr. Hays as an expert.

MR. GORDON: Thank you, Your Honor.

In what capacity were you employed in this particular case -- Master Lending Group, LLC?

THE WITNESS: Forensic accountant to the Chapter 7 Trustee.

Q And describe generally your efforts today -- just generally -- on behalf of the bankruptcy estate.

A We've been finding and firming the source of use of funds in the estate and review issues with creditors and just to gain a great understanding of the case and where the money came in and what went out has been our primary focus.

Q And, approximately, how many hours have you already devoted to this effort?

A I looked this morning and I had 158 hours in the case.
Q One hundred fifty-eight?
A Right.
Q And in the course of your examination of documents and what evidence you can find, have you seen evidence of transfers from -- I am going to refer to it as MLG instead of saying the full name each time, but transfers from MLG to an entity named Low Country?
A I have.
Q And is that an LLC?
A It is.
Q And was Greg Hirsch involved with that?
A He was the sole -- the sole member of Low Country Development.
Q And were those transfers in the millions of dollars?
A They were.
Q And did you find evidence of transfers from MLG to Hirsch and Company?
A I did.
Q And is Hirsch and Company an LLC, sole proprietorship? What do you know?
A It is a sole proprietorship at about 3.2 million went to Hirsch and Company.
Q Who was it the sole proprietor of?
A Say that again.

Q The sole proprietor is who?
A Gregory Hirsch.
Q And have you seen evidence of transfers from MLG to Judy Hirsch?
A I have.
Q And have you seen transfers from MLC to Greg Hirsch individually?
A I have.
Q And in the millions of dollars?
A I forgot the number. It is in my schedule that we might, I'm guessing, will go through.
Q In the course of your investigation have you ---
THE COURT: Well, excuse me. As to ---
MR. GORDON: I'm sorry.
THE COURT: As to Mrs. Judy Hirsch, was it millions?
THE WITNESS: No, no. She's -- we have a schedule that has that number, but it was only like 115,000 --
THE COURT: Oh, okay.
THE WITNESS: -- as I recall.
THE COURT: All right. Thank you.
Q The check -- I do see the check you gave me -- $110,000 to Mrs. Hirsch -- dated November 10 of 2016. Is this the same one you're referring to?
A Yes. Check 1637, 11/10/16 for 110,000.
Q And have you identified or seen summaries that were

provided to you of how many life insurance policies were on the life of Gregory Hirsch?

A I have.

Q And, approximately, how many life insurance policies in the dollar death benefit value of those have you seen?

MR. JONES: One moment, Your Honor. I might want to interpose an objection to that. I don't think a proper foundation has been laid for this document that he's about to testify on.

THE COURT: All right.

MR. GORDON: We have the document, Your Honor, but let me be very clear Mr. Jones was not part of the discussions I had with other counsel before the hearing. None of these documents are being -- are going to be tendered for the purpose of admitting them as fact. They are just to explain the course of investigation and the conclusions that the Trustee has reached thus far as to indicia of Ponzi schemes or other fraud, fraudulent activity, and on that basis we don't need the same kind of foundation. We're not tendering it to establish the truth of the information set forth therein. It is just the role it plays in his conclusions to this point.

THE COURT: Well, do you have copies of the returns? I mean, the life insurance policies?

MR. GORDON: No, we were just recently provided with a summary out of other -- out of files that were provided to us

of -- well, I'll let Mr. Hays explain.

Where did the document come from?

THE WITNESS: I understand it was provided by Mr. Hill recently and it's a schedule of about 25 life insurance policies, total about $35 million in death benefit as I recall.

MR. BANTER: Your Honor -- I'm sorry.

THE COURT: Yes?

MR. BANTER: I'd like to object on a few purposes. One is lack of foundation. Two is a hearsay objection. He is testifying to what the document itself is saying. I understand the counterpoint is it's not being offered to the truth of the matter asserted, but I think that's exactly what it is being offered for. He is testifying to what the document is saying to, quote, to make this conclusions of what his examination has found. That's exactly what the truth of the matter asserted is for hearsay. So I guess a foundation and a hearsay example, and, third, Your Honor, to the extent there is any attorney-client privilege, we would object on that basis as well.

MR. GORDON: Well, there is no attorney-client privilege because it was provided to third parties. We were provided the document already. So it's certainly not privileged. As to the hearsay, this is the exception to the hearsay, and, I mean, there's hardly a federal court case with an expert where this issue doesn't come up and where the expert

is simply explaining how they got to conclusions as opposed to trying to tender the document for the proof -- to establish the proof of what it contains is always admissible as an exception to hearsay.

In terms of the foundation the document was handed to us. It came through Mr. Hill and it was in the records that were turned over to the Trustee when the Trustee waived the attorney-client privilege and demanded documents. That was part of the documents that were turned over to the Trustee. Now we just got these and we don't know -- we've not had time to do the discovery to ask for every one of these insurance policies. That's going to take some time.

THE COURT: Well, first of all, I'll overrule the objection.

Let me assure you, Mr. Banter, I am not accepting as a fact the truth of the amount of the policies. It would surprise me if one person could insure themselves for that much all at the same time. I mean, maybe these policies replace themselves, but I thought life insurance companies were pretty savvy and would only sell you so much life insurance, but maybe I am ignorant about that.

MR. GORDON: Well, I don't want to comment, Your Honor, but they'll say I don't have a proper foundation, but the -- but, Your Honor ---

THE COURT: So I'll allow it for the limited purpose

of Mr. Hays explaining what he has done and what information he's relying on. That doesn't mean that the information I'm taking is accurate. As far as your objection to attorney-client privilege, if the document -- if it's just a document that has been turned over to counsel in the form of a summary, I don't know how that's privileged. Mr. Hill represented the debtor --

MR. BANTER: Your Honor ---

THE COURT: -- and turned over documents.

MR. BANTER: Sorry. I didn't mean to interrupt, Your Honor.

THE COURT: Yes, sir.

MR. BANTER: To clarify as we've heard so far is that Mr. Hill turned it over. An attorney cannot waive the attorney-client privilege. This is assuming that this attorney-client privilege is between the debtor and the Trustee. We don't know the foundation of where this document was prepared from based on what you've heard so far. There is attorney-client privilege we would contend I think that's already been asserted between Ms. Judy Hirsch who is not my client but also Gregory Hirsch who is the sole member of Master Lending Group. There's multiple attorney-client privileges here that are the scope of this document and one -- only the client itself can waive the attorney-client privilege, not the client -- excuse me -- not the attorney there.

MR. GORDON: You talk about lack of foundation, Your Honor. If they want to put Judy Hirsch up, we're happy for that to happen and try to establish that -- why she thinks there is an attorney-client privilege between her, but I'm told she's not in the courtroom.

THE COURT: Mr. Gordon, what is the purpose of asking Mr. Hays about these policies?

MR. GORDON: Because certain family members of this 37 million are listed as the beneficiary in virtually all of them and that's going to be a hallmark -- that's a hallmark of a Ponzi scheme is self-enrichment and he's just trying to -- again, we're not establishing -- we don't even know ourselves if this is all factual yet. We just know that a document showed up in the turnover that was a summary that lists all of these life insurance policies on the life of Gregory Hirsch and there are an awful lot of them -- about 37 million, I think -- and they list mostly Judy Hirsch as the beneficiary.

THE COURT: All right. Well, counsel, just for your benefit -- Mr. Jones, do you wish to be heard?

MR. JONES: I'm sorry. I'll let the Court finish.

THE COURT: Okay. I am allowing this examination of Mr. Hays because I believe it will be useful to the Court's understanding of the discovery issues and this is a useful example; right? We're learning about a document or set of documents that need to be explored, but, Mr. Gordon, I want you

to proceed cautiously on the subject. I get the idea. There is insurance policies out there on Mr. Hirsch's life. You think that may be where some of the money went, and I don't know what else we need to add to that. I mean, that cat is out of the bag; right? So, anything further that you need to talk about that?

MR. GORDON: Not on that point, Your Honor. No.

THE COURT: All right. Well, let's proceed.

Q Let's make it easier. Mr. Hays, could you further describe to the Court any hallmarks of a Ponzi scheme that you have uncovered to date and feel free to refer to the exhibits that you need to explain how you reached those conclusions. I am not asking you to say absolutely that it's a Ponzi scheme at this early stage. I am only asking you to describe any hallmarks of a Ponzi scheme that you have uncovered to date.

A I'll start out that this is very preliminary, Your Honor and we still have a lot of holes in our database. We prepared a database that goes back to 2013 where we start. We see $85 million coming in and going out in our analysis right now. We still don't have a lot of the wire transfer information, but when we're looking at a Ponzi scheme or fraud scheme, we're looking at any legitimate business and we don't see any legitimate business since about 2018 and from the time from 2018 to through 2023 about 20 million came in from investors -- 23 million in the last five years -- and so out of that there

was no business activity during that period of time.

The last real real estate deals were in 2018 and during that same time I don't have the number of exactly how much was paid back to investors, but one of the hallmarks is there was no business and all the money was going to investors. We were writing about 13-, 1400 checks a year and all the activity was going to investors. I mean, a lot of all investor activity and no business activity is a hallmark of a Ponzi scheme.

Secrecy is another hallmark and none of the investors that I've spoken to -- and I've spoken to a lot of the investors and their lawyers -- they didn't really know what they were investing in. They had a promissory note, a short-term note. They were paying 10 to 12 percent. Some were 15 percent. So they were being paid high returns which is another hallmark and they were paying high returns, don't really know what they invested in.

They've got -- they just know Mr. Hirsch and they trust him and he is their friend and he is their accountant and so they invest with him and not knowing exactly where the money is or what happened, and so it's a tight-knit group of investors from what I understand -- the people that I've talked to and we talked about secrecy -- insolvent -- the debtor was -- and I don't know exactly when the insolvency started.

In 2013 is when Mr. Riddle -- we talked about him earlier. Mr. Riddle paid off his note. It was about $15 million. We

did that 2004 exam and I tried to reach Mr. Riddle and I was surprised when I sent emails and he called me back one day. He lives out in Montana or Wyoming now and he and I talked and he said, "I paid all that stuff off." So I was able to go back and look at some of the information I have and verify that he wired back close to 15 million in 2013. So sometime between after 2013 -- he might have been solvent then, but after that I doubt he was -- and I don't want to give a specific day, but he was insolvent the whole time, I'm sure.

THE COURT: You said "he". Do you mean the debtor?

THE WITNESS: The debtor. I'm sorry. I'm sorry.

THE COURT: Yeah.

Q You mentioned that Mr. Hirsch was an accountant to a lot of the investors. In what condition did you find the books and records and is what you found also a hallmark of a Ponzi scheme?

A Well, for being a CPA and accountant, Mr. Hirsch didn't do much accounting from this company. I mean, there was really almost no records. One employee of Hirsch & Tucker did some accounting and kept track of the checks and that was the only accounting that we've seen done by -- well, that was done by Hirsch & Tucker. Investors received no statements, no annual statements. They would receive a tax return ---

THE COURT: Let me back up. What did the firm -- you said that Hirsch was the accountant to some of these investors.

Was Hirsch & Tucker the accountant for the investors or Mr. Hirsch himself?

THE WITNESS: Hirsch & Tucker was also the accountant to many of the investors.

THE COURT: How do you know that?

THE WITNESS: Talking to investors --

THE COURT: Okay.

THE WITNESS: -- and talking with counsel for Hirsch And Tucker.

THE COURT: Okay.

THE WITNESS: I mean, we're not trying to get to any of the records of Hirsch & Tucker or their -- we don't want the individuals' tax returns. That's not what we're getting at.

Q Have you discovered memos in the records that were turned over to the Trustee?

A Let me just ask you -- to finish your last question.

Q Go ahead.

A The question was what records did we receive and we received two boxes of records -- very scattered, disorganized, not even sorted by year or by subject matter, just piles of paper, just assorted paper and my understanding was that they just -- Hirsch & Tucker had somebody go through the office and pick up every Master Lending document they could find. We have some stuff from '06, '05, early years, and then, you know, we might have some '13 and '14 information.

Luckily, there were a lot of CD roms that had information from 2011 through about '16 and so we downloaded all the information from the CD roms and entered all of that in the database. We're missing maybe 10, 12 months in there of different sporadic information, but at least we're able to go back and look at the investor information and make a reliable database and then from 2016 forward we had the subpoena from SunTrust Bank and so we had those records that we got together and put in a database. So we've made a fairly comprehensive database.

We're missing -- and we'll look at that summary chart, I'm sure. We're missing about -- I think the number is about 12 million incoming which is probably -- it is investor money that we don't know and what we're trying to do is identify all the investor money coming in to make certain we got all the investor money, that it didn't go to Hirsch & Tucker, it didn't go to Low Country, it didn't go somewhere else. We need to go through and verify that compared to what the investors claim so that we're confident that we got all the money and all the investor money was deposited in the entity that -- I always find in these Ponzi schemes is that the money gets deposited in another company. So that's also hallmark that we -- common characteristic.

Q And did you discover or was it turned over to you different memos including from Mr. Hirsch himself describing the nature

of the business at that particular point in time?
A Yes, we had one long memorandum in 2013.
MR. BANTER: Objection, Your Honor. Objection, Your Honor. He is testifying about the contents and substance of a document. That's hearsay. He is testifying about hearsay within a document.
Q Well, let's talk about this specific document. Is this Exhibit 19 or are you talking about another exhibit?
A Well, there's two exhibits we'll need. Exhibit 19.
Q All right. And ---
THE COURT: Do you have that, Mr. Banter?
MR. BANTER: Yes, Your Honor, and if I may, we did meet before and when we exchanged documents I think the Chapter 7 Trustee had 25 documents. We have no objection to, I believe, 21 of the 25. We stipulated to that. T-19, which it sounds like we're about to hear testimony about, we do have an objection about, Your Honor.
MR. GORDON: It is the same kind of objection as before, Your Honor. I mean, this was a document turned over; is that right? It was turned over to you?
THE WITNESS: This was an original document we found in the boxes that was turned over to us, yes.
Q And ---
MR. BANTER: Your Honor, I'm sorry. I didn't mean to interrupt you, Mr. Gordon, but it's not exactly the same

objection, Your Honor. I think there is hearsay from what I've heard that Mr. Hays is about to testify to the substance of that document. This document appears not to be signed or dated. I'm not sure what hearsay exception it would be if a business record but none of those applies. We're not sure of this document's truth-worthiness as it's not signed or nor dated.

THE COURT: Well, there is a multi-page document that Mr. Hays has looked at and what's the import of that? I mean, that's just -- he is just piecing together his suspicions right now. We don't have a Ponzi scheme yet. We got a suspicion of a Ponzi scheme; right?

MR. GORDON: That's correct and this document further supports what Mr. Hays has been testifying about and even summarizes it in a very -- in a way that we can understand why other people would be objecting to it because it is very -- but we're not seeking to admit it for the content of it.

THE COURT: Well, hold on.

MR. GORDON: It just relates to his investigation.

THE COURT: Who authored it?

MR. GORDON: It purports to be from Mr. Hirsch, I believe.

MR. BANTER: Your Honor ---

THE COURT: I thought you said it was unsigned.

MR. GORDON: That's what it says, but it comes from --

it's in the first person and talking as Mr. Hirsch even if it is unsigned as emails often are.

Why don't you describe it without, you know, how you see -- how you identify it as being from him?

THE WITNESS: This document was found in the original boxes. I believe I have also seen it in the document production, the electronic records. We just got the electronic access a couple of days ago, but I believe I've seen it in Relativity. This exact same document came off of his computer -- Greg Hirsch's computer.

THE COURT: Well, where did you -- you gave it to Mr. Hays; right, Mr. Gordon?

MR. GORDON: No, I did not.

THE COURT: Well, where did you -- where did you -- I'm not understanding.

MR. GORDON: He gave it to me.

THE WITNESS: This document was in the original records produced to the Trustee that were given to me.

THE COURT: From Mr. Hill to Ms. Caron?

THE WITNESS: Right.

THE COURT: And this was in there?

THE WITNESS: This was in there.

THE COURT: And you don't know who authored it?

THE WITNESS: Well, from working on the case I'm confident that Mr. Hirsch wrote this.

THE COURT: But you don't know that.

THE WITNESS: I don't know -- well, I see it on -- on his emails. In the production we just got this week, I believe -- I believe I saw it Monday night, an original in his emails. I can't ---

THE COURT: Well, you don't even know that an email that you think is his email is his email; right? I mean, somebody gave you a copy and it looks like an email from him; right?

MR. GORDON: Well, explain the Relativity because that came up earlier in the case and how -- what that's all about.

THE WITNESS: All of the hard drive from Hirsch & Tucker is in the process of being uploaded so that we can review the documents. We have a document list that we're going to be able to have access to. The emails that were on the Hirsch & Tucker server are being uploaded into this database system called Relativity.

THE COURT: By agreement with Mr. Brennan?

THE WITNESS: Right.

THE COURT: Is that right, Mr. Brennan?

MR. BRENNAN: That's right, Your Honor.

THE COURT: So you've turned over these emails.

MR. BRENNAN: We have gathered emails from our Outlook server that were Mr. Hirsch's emails --

THE COURT: Okay.

MR. BRENNAN: -- on our server. We have applied key words to those emails to extract them into the emails going back five, six, seven years. We had, I think, 24 simple key words that we applied and as a result of that we have about -- I think it's about 13,000 emails just using those key words alone.

THE COURT: All right.

MR. BRENNAN: We have uploaded some of those where we determined that there is no tax information involved. It doesn't appear to be Mr. Hirsch's personal healthcare information or anything like that because they were responsive to the 2004 subpoena that we received.

THE COURT: All right. So from your perspective you've disclosed everything that has been uploaded in this -- what's it called? Relativity?

MR. GORDON: Relativity.

THE WITNESS: That's Right, Your Honor.

THE COURT: That's a piece of software?

THE WITNESS: Right.

THE COURT: Okay.

MR. BRENNAN: It's an electronic document portal where people can access this type of information.

THE COURT: All right. So from your perspective those are fair game for the Trustee?

MR. BRENNAN: Certainly, responsive to the 2004

subpoena that Your Honor signed in this case.

THE COURT: I don't know that I signed the subpoena, but -- is it your testimony that not only was that document in the box but it was among the emails?

THE WITNESS: It was Monday night late when I got access. I'm 99 percent certain, but I am not going to swear to God that I got it.

MR. BANTER: Your Honor --

THE WITNESS: But I've seen it before.

THE COURT: Yes, Mr. Banter?

MR. BANTER: Sorry. I didn't mean to interrupt. T-19 has no indication that it is an email. There is no "to", no "from", no timestamp, no subject. No one is sure if this is an email. I think it was referenced to begin with as a memo. There is no author of the memo. There is no timestamp with this memo. There is no -- I don't see how this can be a business exception, a business record under 804(d). This is hearsay, Your Honor.

MR. GORDON: Well, we know it's hearsay. That's why we're saying its an exception to hearsay.

THE COURT: All right. But, Mr. Banter, again, I'm not -- if I admit it I am not accepting it for the truth of what's in it, but once Mr. Hays is in possession of it it might lead him and the Trustee in a particular direction and that direction may prove to be completely wrong and unfounded. They

may be going down a rabbit hole. This may be -- maybe he was working on a novel or something. Who knows? But so I'm not accepting it for the truth, but Mr. Hays is testifying about what his process has been and where his investigation is going and the reason I think that's useful to me and to you is so that we all collectively can try to figure out the most efficient direction for discovery which will save your client and everybody's client some money if we can figure out where things are going.

MR. BANTER: Yes, Your Honor, and I'm trying to be careful because I think the Court acknowledged earlier this is a fine line. As I understand his testimony he is testifying to what he has looked at and relying on to form conclusions. Therefore, to form those conclusions he's having to testify what the substance of the email says. That renders it hearsay. So, Your Honor, we're not calling it a duck, but it's quacking like a duck, and I think that's what we are, Your Honor.

THE COURT: I think Mr. Gordon acknowledges that it's hearsay, but it's not being offered for the truth of the matter asserted. So I guess circular reasoning it's not hearsay if that's the purpose of it.

MR. GORDON: Again, Your Honor, it is. That is the purpose and I might also add that it is about two and a half pages single spaced long. So it's -- and it's written as if -- only by somebody that would have intimate knowledge of MLG and

that's why Mr. Hays thinks that it came from -- but we can't say absolutely. That's why we're not tendering it for anything other than what's motivating him to go in certain directions with this.

THE COURT: I am going to respectfully overrule your objection and allow it for the limited purpose of what's going on here and this is just sort of a preliminary report of the status of the Trustee's efforts which I view as a way to help the court decide these various discovery issues that I have before me.

MR. BANTER: Thank you, Your Honor.

Q Do you have Exhibit 19?

A I have it in my hands, yes, sir.

Q Okay. And what -- did you view this as an indicia of a Ponzi scheme -- the content of this?

A Well, there is one sentence in here that -- again, this is 2013 and it says, "It has become a time" -- excuse me. "It has become a time consuming juggling act for me with the passing of time and inability of Riddle to pay down principal. I am forced to find new lenders to take the place of existing lenders and to try to maintain a pool of potential lenders. It's a constant battle."

Q So, let's move on. I am not going to have you read this two and a half page memo, but I know it was on our list. Now what other hallmarks of a Ponzi scheme have you seen? You've

already named quite a few but -- and feel free to either reference specific exhibits or not.

A Well, I think we ought to read this other sentence into the record here on the back of the second page where he's talking about all the federal agencies that are going to get involved if there is a -- if it comes out. "There will be various governmental agencies involved in investigations including the IRS, the U.S. Department of Labor, the U.S. Attorney's Office, et cetera. The investigation would inevitably include the recipient of borrowed funds and its operations and use of those funds."

Q Now you ---

A Another hallmark on a Ponzi scheme is like commingled funds and here we've got -- we'll look at some of the exhibits show the money going to Hirsch and Company and Low Country Development where it was all commingled and it's really just one pot the way it seems to look. I mean, money is coming back. He is lending money under one name under Master Lending Group and it's coming back to Low Country Development. So and we have a schedule map that shows that he lost that $5 million with one group. When I say "he" I'm talking about Master Lending Group.

Q So and Low Country was an LLC that he was a sole member of?

A That's correct. We ought to look at that exhibit while we're here. I think it's the last exhibit you had which is

Exhibit --

Q Do you need the list?

A -- T-25.

MR. BANTER: Your Honor, as I said earlier, we do not object to these exhibits being tendered. The only thing we would ask and we did discuss it beforehand is that to the extent these are summaries of Mr. Hays' investigation under Rule 1009 we ask that the supporting documents for those summaries be provided to us and my understanding is they would get us copies of the information.

THE COURT: Is that correct, Mr. Gordon?

MR. GORDON: Well, yes because to provide summary evidence -- and I was going to go through this and I ask that they be admitted for the limited purposes that we talked about here -- one of the things that we're required to do is make them available and we'll certainly do that.

THE COURT: All right.

MR. GORDON: But, absolutely.

THE WITNESS: I am looking at Exhibit T-25. It is an analysis that I put together and this is transactions -- Master Lending Group transactions with Synergy Designer Homes and what this shows is Synergy -- Master Lending Group -- and I'll list them starting with 2014. Master Lending Group paid to Synergy Designer Homes $9,012,500. Master Lending Group was paid back 1.8 million. Okay?

This was the second biggest issue in the case. Other than life insurance this transaction with Synergy homes is a major issue. What's interesting is that you've also got payments coming back from Synergy Designer Homes and the payments -- most of the payments coming back were to Low Country Development which is a Hirsch-owned entity and 2.5 million comes back to Low Country. So I don't know -- we haven't seen any document as to why Low Country would be paid back money that was lent by Master Lending Group.

Q So you're saying that the money that went out from MLG was drawn on MLG accounts and the money that came back -- some came to Low Country, some came to MLG?

A That's correct. And I listed the check numbers and what -- we have copies of all these checks and in -- the second page here I show between the two entities 9.5 going out and 4.3 coming back. So I've got like a 5 million-dollar gap and I've shared this analysis, oh, about two months ago with counsel for Synergy Designer Homes and we've been going back and forth on the phone and trying to get some resolution of this matter, and, in fact, I just got an email today and Synergy Designer Homes -- its owner named Reed Brannon -- wants to try to work out some sort of resolution with the Trustee. I don't know. There's been no offer yet, but it's a huge nut. It is a $5 million.

MR. GORDON: And they're in bad shape financially --

Synergy.

THE COURT: Well, what -- do they build houses?

MR. GORDON: I don't know that they're doing anything anymore.

THE WITNESS: My understanding from their counsel is they're out of business. So I don't know what's going to happen.

Q And so they don't dispute -- as I understand it, they don't dispute the obligation that's outstanding. I think they're the ones who showed us evidence that they've been repaying Low Country. That's where we found out about it and every time you turn over a rock or something, it's not where it should be and it's made very, very difficult for Mr. Hays, but I didn't mean to interrupt. Go ahead.

A No. Your point was exactly right. They showed us the transactions when they sold homes, the wire transfers that were coming into Low Country Development. So that's how we know about them because we don't have the Low Country records today. So I don't know what -- I don't know what the Trustee recovered from this action. I don't expect it is going to be enough to make a huge dent to the investors that are looking for $40 million but ---

THE COURT: Well, I don't even -- you haven't told me anything about Synergy. I have no idea what the relationship is between MLG and Synergy.

THE WITNESS: There was a -- there was a loan. Master Lending had a loan with Synergy Development Group. It was lending money.

THE COURT: You've seen the promissory note?

THE WITNESS: I have not.

THE COURT: Well, how do you know there was a loan?

THE WITNESS: Because it references the checks to loan advances.

THE COURT: That's in the memo section on the checks? Is that what you said?

THE WITNESS: It's -- I don't have that document with me, but it's an understanding. I might have seen the note. I don't recall, but I know there was a note. I mean, their attorney acknowledges that there was transactions. There was a note.

THE COURT: All right. Well, I don't need to remind counsel that when we get down to proving facts it's going to have to be better than --

MR. GORDON: Of course.

THE COURT: -- this sort of thing, but we're in the beginning stages of a long slog, so.

MR. GORDON: When the books and records are in the shape that were here, Your Honor, this is going to take a long time.

THE COURT: Well, I just -- other counsel in the room

-- Mr. Banter -- might be frustrated that this witness is testifying about, you know, loans and we don't -- I don't know that there is a loan. I haven't heard anything about -- that would satisfy me there was a loan.

THE WITNESS: Well, Your Honor, their counsel acknowledging it's a loan and willing to work out something to pay something back to the Trustee, so.

Q And what else did you want to report to the Court?

A Did you want to introduce Exhibit 13?

MR. BANTER: Your Honor, that's one of the exhibits we would be objecting to.

MR. GORDON: Is that one of the ones?

MR. BANTER: T-13.

MR. GORDON: Is that one of the ones you objected to?

MR. BANTER: Yes.

Q Okay. It's your testimony, Mr. Hays. Is that something you want to refer to?

A It's a document that I found under the Relativity database just Monday night.

Q Well, would you describe the document?

A It's ---

MR. BANTER: Your Honor --

THE COURT: Yes, sir?

MR. BANTER: -- I'm not sure whether there is even an attempt to tender this exhibit or not, but he is referencing

T-13. Again, we would object to this document. This is not the one of the ones we stipulated to. It is the same objection of hearsay. This appears to be some type of email. I think the testimony was that he just found it in Relativity. However, it's between what appears to be counsel for Mr. Hirsch of some type, but, again, this is hearsay. He is again testifying to the substance of the document. There's been no foundation for this document laid and there would be some type of attorney-client privilege, and before we get too far in this document, we want to lay these objections for the record.

MR. GORDON: I didn't actually have this on my list.

So just why -- tell the Court -- is this document meaningful before you describe what's in it?

THE WITNESS: It just explains his -- some of his personal financial transactions with Master Lending Group.

Q Whose personal financial ---

A Greg Hirsch.

MR. GORDON: I am looking at it, Your Honor. It is -- it's an important document. In fact, it's a critical document, and although we're not tendering it again for purpose of the truth of what it states, if I was the forensic in this and I saw this document ---

MR. BANTER: Your Honor, I'm sorry. Is Mr. Gordon testifying or is Mr. Hays testifying?

MR. GORDON: No, I haven't said what's in the

document. I am going to let Mr. Hays do that, but I am just addressing your objection. It is a critical document. I am seeing it now and now I know why it's important to your testimony, but, again, it is going to explain why the estate believes it should be going in certain directions that people might not otherwise realize.

THE COURT: Well, where did this document come from? It's in a notebook that was delivered to chambers. I presume that was done by consent of the parties?

MR. GORDON: This document?

THE COURT: Yeah.

MR. GORDON: Oh, it's in the exhibit list. It is one of the four I believe counsel said that they are objecting to. We've gone through, I believe, the others.

THE COURT: So I don't have this -- it's between number 12 and number 14, but it doesn't have a 13 on it. So but it looks like some kind of email.

MR. GORDON: It is an email -- just from a distance, very short. Very short. And, again, I would assert that for purposes -- it's an exception to hearsay because we're not tendering it for any purpose other than the motivation of -- and the forensic direction and why Mr. Hays would go in a particular direction. I think it's probably going to be helpful to everybody in the room, too, to know what this email says even though it's very short.

THE COURT: All right. I am going to allow it, Mr. Banter -- not for the truth of it. It's clearly hearsay, but if it explains the direction that Mr. Hays is taking his investigation, then I want to hear about it.

MR. BANTER: Yes, Your Honor. Again, there's been no foundation for this email laid at all. I think the Court would be interested to hear who is the sender and recipient -- or sender and author of the email because, again, I think that will also invoke the attorney-client privilege emails for us.

THE COURT: All right. So, well, I do see that it's from -- no, it's to a lawyer.

Do you have any reason to know the relationship between Mr. Hirsch and that named lawyer?

MR. GORDON: I don't even know that -- I didn't even know that person was a lawyer.

THE COURT: He was a classmate of mine.

MR. GORDON: Oh, is that right? I don't know. I am not familiar with his name, but the -- but whether this was supposed to be that they're just friends or it's some sort of attorney-client, I don't know, but ---

THE COURT: Mr. Hill ---

MR. GORDON: -- but the document was produced. So there is no privilege anymore.

MR. BANTER: Well, then that's not -- I'm sorry, Your Honor. I'll let Mr. Hill go.

MR. HILL: Yeah, it seems like every time I stand up I get myself in trouble, but Mr. Feemster represented Mr. Hirsch in a lawsuit against Truist Bank that arose from an employee of Master Lending Group embezzling funds. They laid some blame for that, I believe, at the feet of Truist or what was Suntrust back then and filed a lawsuit and Mr. Feemster was his attorney in that matter.

THE COURT: Embezzlement. Okay.

MR. GORDON: Your Honor ---

THE COURT: You buried the lead there, Mr. Gordon. Yep, that would have been interesting information, but I don't know if it was actually embezzlement, but Mr. Hill has now revealed that the sender or the recipient is lawyer Dwight Feemster. So I don't know whether he represents -- but Mr. Gordon takes the position that if this was a privileged document, once it was turned over to, you know, the man on the street, it loses its privilege or is there some clawback provision the courts have recognized?

MR. GORDON: It's been published at this point. I mean, it was turned over to the Chapter 7 Trustee. The Chapter 7 Trustee uses everything the Chapter 7 Trustee has. The attorney-client privilege is to keep the Chapter 7 Trustee from getting a document, but once she has it, she has it.

MR. BANTER: Your Honor, I have two points on that. Only a client can waive attorney-client privilege, not an

attorney. We've heard that these documents have been turned over to the Chapter 7 Trustee. The question should be who turned them over. It was not Greg Hirsch, nor was it Judy Hirsch. Again, only the client can turn over the document and waive any privilege they have. To the extent that this has been produced, we would ask the court to claw back -- to send this document back to the client who, again, controls and owns that privilege.

MR. GORDON: Well, these came out of ---

THE COURT: I am not familiar with the case law on this notion of "oops". I think it happens in the area of faxes. You know, lawyers -- when fax machines first came out they would put these disclaimers on the bottom and say if I sent this to the wrong person, you know, please send it back. Don't read it. Unread it. Whatever. And I think some case law has developed about what remedies there might be to sort of undo an inadvertent disclosure, but I am not sure this would fall in that realm, but, anyway.

MR. BANTER: At the onset, Your Honor, even if there is no clawback provision which we contend there should be, if all we're here today is to hear about what is authorized Mr. Hays to come to the conclusions he has and we're being very sensitive these are not being offered for the truth of the matter asserted, we would caution then that warrants to any doubt that this email should not be read at all -- that there

is an attorney-client privilege which is a sacred held by the client. Even more so we would be insistent to this line that this email should not be read at this time.

MR. GORDON: Your Honor, I -- I'm sorry. I didn't see.

MR. PASCHKE: I'm sorry, Your Honor. I am just going to make a point that if the lawsuit was MLG versus the bank, then the client is MLG and the Chapter 7 Trustee holds the privilege and can waive it. Thank you, Your Honor.

MR. GORDON: Your Honor, that was what I was about to say, Your Honor, is that my understanding was that it was MLG that was being represented, not Greg Hirsch individually, and, obviously, the Trustee ---

THE COURT: By Mr. Feemster?

MR. GORDON: Yes.

THE COURT: Well, how do you know that? I mean ---

MS. CARON: Your Honor, I sent the letter to Mr. Feemster at the beginning of this case waiving the attorney-client privilege so we could get the Dean Flake lawsuit documents that he had in his file.

THE COURT: Did he send you anything?

MS. CARON: Yes, Your Honor.

THE COURT: Did he send you this?

MS. CARON: I don't remember this email, but I think he sent us -- he sent us a bunch of documents.

MR. GORDON: That he was representing MLG is the point, Your Honor. We couldn't have gotten that if he was representing Greg Hirsch. We couldn't have gotten these documents. This is referring to the lawsuit that MLG was involved in that was just described and I think, you know, very clearly there is no privilege here protecting a document that's sent on behalf of MLG.

THE COURT: Mr. Banter?

MR. BANTER: Nothing on the four corners of the document displaying everything we're hearing. We have not heard anything in the way of evidence for the Court to hear establishing what attorney-client relationship we have had except for the acknowledgment that Mr. Feemster is an attorney and he did have some type of relationship with Greg Hirsch. Again, the four corners of the document -- nothing else can explain everything else to allow this document to come in at this time.

THE COURT: All right. Mr. Gordon, let's see if we can move on. I want to know the direction that Mr. Hays has taken and where he's going, but I think we've gotten as much out of this email as we need to for today's purposes.

THE WITNESS: That's fine. I can explain the point in the documents you'll see by talking about other issues.

Q Go ahead. Continue.

A Let's look real quick at Exhibit No. 14. T-14. This is

just a summary that I've been working on, Your Honor, that's a list of the real estate deals that Master Lending Group and Greg Hirsch were involved in over the last 10 years. It's a lot of holes in this. The gray areas on here are the holes where I don't know what money came back or went out or what came back. We've got some documents we're going to have to do a lot of discovery to understand exactly what happened here, but if you look to the left of last column of numbers for the middle of the page, gain or loss, from what we have now we show -- he didn't make much money in these real estate deals from what we know now and so preliminarily I've got a loss of 2.3 million, but I don't have everything in here.

He needed to make about five or six -- Master Lending needed to make 5- or $6 million a year just to break even to pay their interest and this is -- this is the business activity and if you look down we have the Riddle document in there. We see he loaned out 16.5 million and got 17 back. That would include the interest. We've got Synergy that we've talked about and we show 9.9 million going out and 1.5 coming back, but there are a lot of other small real estate deals in here that we're going to have to do a lot of discovery on and we're going to have to do 2004s on all of these investment deals to understand exactly what we've got here.

So it's very preliminary. It's not -- it's not -- I can't document everything that's on here now and this is the best

we've been able to come up with. We've just gotten access to the emails and the records. We hope we find a lot of emails and closing documents that explain some of these transactions but the point of this is there was very limited business activity and if you look down at the date -- the loan date column -- you see most of these loans were -- the last one was a 2018 and that was 10 West Victory was one and the information I have on 10 West Victory is he lost $317,000 on that transaction.

So it's going to be -- we'll be updating this as we get new documents and I'll just preliminarily tell the Court that we don't see a lot of business activity which is the hallmark of Ponzi scheme we talked about.

Q Have you seen loans that were made for -- at interest rates that are less than what were promised to the investors?

A I saw investors being paid 12 to 15 percent, some 10 percent, and I saw some of these loans were going out at 8 percent. So he's certainly not sustainable when he was borrowing money at 12 to 15 percent and loaning it out at 8 percent.

THE COURT: So on this Exhibit T-14 when Master Lending is investing in a property they don't have any upside for appreciation? They're just loaning money at a fixed rate of interest?

THE WITNESS: I think most of them were like that,

Your Honor.

THE COURT: And would those -- so when there was a security deed there would be a related promissory note?

THE WITNESS: Right.

THE COURT: And are those -- are they ---

THE WITNESS: Some of those were lower than what he was paying investors.

THE COURT: Okay. I don't know, but in a typical real estate transaction where there is a recorded security deed the promissory note is not always recorded; right?

MR. GORDON: It is rarely recorded.

THE COURT: Right. Okay. So how would you -- but is the promissory note referenced in the security deed?

THE WITNESS: If it is referenced for -- some of them if I reference a promissory note, it is something that we found in the original records. The records, again, are very sporadic. Nothing was organized. This is all I've been able to piece together from every piece of paper I've looked at and so I've got a lot of work to finish the bustle.

MR. GORDON: The promissory notes are usually referenced, but the terms are not always referenced is what Your Honor is getting at and you're right. You have to usually come up with another document that has those terms.

THE COURT: Well, Mr. Hays just suggested that Rule 2004s would have to be conducted on all of these

transactions. I hope you don't share that belief. I mean, you got a telephone; right? You can call and inquire without taking a deposition every five minutes; right?

MR. GORDON: Well, sure, particularly, if there is an attorney that was involved on the other side it makes it easier.

THE COURT: Okay.

MR. GORDON: Much more professional.

THE COURT: I just want to make sure we're being efficient with state resources. Please.

THE WITNESS: Well, the Judge made an excellent point -- efficient with state resources. As I sit here today I have no idea how I am going to get paid and I've got a lot of time in this, Your Honor. So there's a lot of lawyers in this room that are getting paid out of life insurance that was here and so the poor Trustee is over here with I think we've got $100,000 in the bank, but we're sitting here not getting paid.

Exhibit 15 is a list of search terms and we mentioned earlier before I came on the stand it's just a list that I put together to give to Hirsch & Tucker's counsel and I've given it to Gregory Hirsch's counsel and this will be -- this will change as you mentioned earlier, Your Honor. I mean, we'll add more and more search terms as we proceed.

THE COURT: All right. Well, so not to digress, but you're familiar with Schedule C's that a taxpayer who is the

sole member of an LLC would use a filing of personal tax return; right?

THE WITNESS: Yes, Your Honor.

THE COURT: And with an entity like this is there -- if you properly file a Schedule C you're just going to have summary numbers like total revenue, total expenses. There's not going to be a lot of detail in that Schedule C about what actually transpired during the tax year for that sole member. Right?

THE WITNESS: You're exactly right, Your Honor, and that's why the Trustee was in shock when Mr. Hill said he produced all the information because all we've seen is the Schedule C which is the one page document for -- I think we had one or two years. He actually showed it as Schedule C that he made a profit in Master Lending Group when there was no profit there. So I -- we have not seen -- we would know all the entities that he had if we had the full tax return and we've been asking for the full tax return and we have never seen it.

MR. HILL: Your Honor, I think I need to clarify my remark.

MR. GORDON: You want to come up here or do you want to stay there?

MR. HILL: I'm comfortable right here.

THE COURT: Can you hear him Elizabeth? Elizabeth, are we recording Mr. Hill?

THE CLERK: Yes, sir.

MR. HILL: You know, I think I just misunderstood and I apologize to everyone. The Trustee is correct. All I sent them was the Schedule C which was the entirety of the return that Master Lending Group filed. I don't have the whole tax return and I think I misspoke.

THE COURT: Okay.

MR. HILL: And I apologize to everybody for any confusion; particularly, Ms. Caron who's understandably --

THE COURT: Understood.

MR. HILL: -- surprised because I did not send her Mr. Hirsch's entire tax return.

THE COURT: Okay.

MR. HILL: I don't have that.

THE COURT: Okay. Thank you for that clarification.

MR. BANTER: I think the testimony was they then requested that the Greg Hirsch personal tax returns has been requested and the estate of Greg Hirsch is not aware of that. We've never been asked for that.

THE COURT: But would you turn them over willingly?

MR. BANTER: If we were asked for it, Your Honor, yes.

THE COURT: All right. Well, you can look for that tomorrow morning, I guess.

Q Continue.

A Thank you. That document should help us to get that tax

return and we could get the records behind that. Exhibit 16 -- I'll just mention it very quickly. This is just a sum of the checks that we've pulled and we, again, have pulled a lot of these going back to the CD roms that we were able to provide and I'll just flip through them really quick.

Check number 1720 is a check for Master Lending Group to Greg Hirsch for 15,000. It's in 10/31/22. Here's a check from Gregory Hirsch -- 1411. He is paying back Master Lending Group in May of this year 350,000. We do know that he liquidated a lot of -- we understand that he liquidated some life insurance policies and this is where the money came from, but we don't know and that's why we need to get to his personal -- we need to get to his personal bank account to see where the money came in. Did the money go from Master Lending to Hirsch and Company to Greg Hirsch and then come back? We don't know. We need to trace all of this money, Your Honor.

THE COURT: When you say "liquidated a life insurance policy," are you saying he got the cash value out or did he do one of those viatical settlements?

THE WITNESS: This is a viatical settlement.

THE COURT: Okay.

THE WITNESS: We know one that was stopped. The sale to Coventry was stopped last fall and the understanding that I have been told is there were other ones that were liquidated.

THE COURT: Okay.

THE WITNESS: Check number 1699, a check from Master Lending Group to Greg Hirsch and Company, $10,000, in 2021.

THE COURT: So these endorsement account numbers -- are those familiar to you?

THE WITNESS: Those are the accounts we're going to be requesting and that Greg Hirsch's counsel has agreed to provide now.

THE COURT: Okay.

THE WITNESS: So check number 1709 is another check from Master Lending for Hirsch and Company, $2,500. Check 1637 from Master Lending Group to Janice Hirsch, 110,000, and it's in 2016. We've talked about that earlier today.

THE COURT: And so that account number endorsed on the back beginning 991 -- is that ever gonna be turned over, Mr. Banter?

MS. HALL: That's Judith Hirsch. That's not our client.

THE COURT: So we don't ---

MS. HALL: Your Honor, the check that he's referring to, that's Judith Hirsch. We would defer to Judith Hirsch's counsel. We can't speak on behalf of Judith Hirsch.

THE COURT: Okay. So that's the same 110,000 we talked about about an hour ago; right?

THE WITNESS: That's correct, Your Honor.

THE COURT: Okay.

THE WITNESS: Then we have a check from Judith Hirsch, check number 6599, that goes from Judith Hirsch to Greg Hirsch for $30,000. That's in 2022. Here's check number 1707 from Master Lending to Low Country Development in 2021 for $20,000 and check number 1544 from Low Country to Master --

Q Master Lending Group.

A -- Master Lending Group. It's hard to read. I'm sorry -- master Lending Group for $60,000. So from what we've seen the money coming into Low Country Development was coming back from Synergy Designer Homes and so this could have been money that was flowing back from that group. So it just -- these checks -- and I don't want to go through all of them, but it just points to the fact that we really are pushing together or piecing together a puzzle from all of this information.

THE COURT: All right. So is Judith's counsel with us?

MR. JONES: Yes, Your Honor.

THE COURT: All right. So are you planning to take the deposition of Mrs. Hirsch?

Mr. Gordon, are you?

MR. GORDON: Yeah, we will eventually. I think we're trying to get our arms around the records as much as we can before we do that. There is an adversary proceeding that's pending. It is limited. It might be expanding, but it is limited right now and these kind of questions are beyond the

scope of what's in that lawsuit I can say, but I'm not expecting any cooperation.

MR. JONES: Your Honor, I can't imagine I have a need to cooperate with a request that's never been made, but I am generally -- I thought I was perceived to be a pretty amenable person.

MR. GORDON: Oh, he is, but he's not the only attorney for her.

MR. JONES: Your Honor, I have been sitting here very quietly, but with all due respect I don't think that type of colloquy is helpful with respect to the comments from the Trustee's counsel.

THE COURT: I agree.

Mr. Gordon, you talk to me.

MR. GORDON: You're right, Your Honor. I apologize.

THE COURT: All right. Go ahead. Any more questions for Mr. Hays?

THE WITNESS: Do you want me to keep going? I was just going to mention quickly and Exhibit No. T-21 just to help explain to the Judge what the analysis that we're going through and I've got all kind of disclaimers on here at the top of it that it is a draft prepared based on available information, that it likely -- it will change. Period. It will change.

The main thing I need to do to finish this analysis is to get all the wire transfer information. We don't have all

the wires yet. So we need to go back to Truist to get all the wire transfer information and so we get that in there. What I have here is a database from 2011 to 2023. It has 83 million received and 84 million out and so I've got a lot of transactions that we're piecing together and coding it by the type of transaction. What I see here ---

MR. GORDON: It is going to take a long time, though, is what I think Mr. Hays is trying to explain with 83 million going in and 84 million going out.

THE WITNESS: I'd say we're about 90 percent done with it. We've got to get the wire transfers is the main issue. Then I want to take all the investor -- when we do the claims analysis for the investors and I want to match up the investor's money coming in to the database, but under Greg Hirsch I've got 5.8 million through -- coming back into the company and 5.4 million going out.

So that's -- we can see down here we talked about earlier -- Hirsch and Company on the first page, 3.2 million went to Hirsch and Company and then I got -- Master Lending got back from Greg Hirsch individually 3.8 million. So that's why we need to get to all these records.

THE COURT: Well, why -- I see an entry here. I think I am lining it up right -- Hirsch & Tucker, sum of receipts 410,000. Does that mean these were payments to Hirsch & Tucker?

THE WITNESS: The Hirsch -- the sum of the payments -- he paid Hirsch & Tucker 110,000 and got back 410,000. So ---

THE COURT: Hirsch & Tucker is an accounting firm; right?

THE WITNESS: That's his accounting firm, Greg Hirsch's accounting firm.

THE COURT: Well, why would -- why would you run anything other than accounting fee through your accounting firm?

THE WITNESS: I can't answer that question other than this is what the checks are -- we're just looking at the checks and this is a summary of what we have today. So we're going to have to go through all of these transactions. This will come out of the deposition. It's a lot of questions to ask here, Your Honor.

THE COURT: Okay.

THE WITNESS: I've got one section here called "Investments". I showed 19 million going out and 32 million coming back in. The number is very high -- the 32 million that's coming back in -- because of all of the money that came in from William Riddle, the 16.5. We will have this analysis and we'll come back to you probably early, early next year with a complete report of all the money that came in and came out. Once we get this initial discovery, we'll be able to finalize this analysis.

Q When you say "come in" -- 32 million came in -- are you including investor money?
A That includes investor money. No, I'm sorry. That's just the -- that's just the real estate transactions in that number.
Q Oh, I see.
A We do have a separate report. In fact, I just had it prepared this morning. There's another column on here in the second page -- actually, it is on the third page -- page three of three for the investors. I show 32 million coming in from investors during this period of time -- this 10-year window -- and I show 53 million going out to all the investors. And so, you know, this is going to take some work to piece together. As soon as we get Hirsch & Tucker -- I mean, Hirsch and Company and Low Country and the wire transfers, it will fill a lot of the gaps.
THE COURT: Anything else of Mr. Hays?
MR. GORDON: No, I just -- just to qualify certain matters, Mr. Hays, is it your testimony that the underlying documents for these summaries that you've been discussing were too voluminous and impractical to produce today and have examined in court?
THE WITNESS: Yes, I do.
Q And is it your testimony that you have personally examined the originals upon which the summaries are based?
A I've looked at all the documents. I haven't looked at

every single check.

Q Is this summary -- these summaries exhibiting fair and accurate summaries of the underlying documents?

A To the best of my knowledge and my staff helped put all of this together.

Q And would these records constitute business records of the Master Lending Group?

A That are all -- the documents that we've looked at, the analysis I've prepared are all based on the activities and the bank accounts of Master Lending Group.

MR. GORDON: Your Honor, I submit that these summaries have been made by a qualified witness are fair and accurate and we only tender them, again, for the limited purpose -- I think you've already ruled that they're in, but I think the summaries came after that -- those rulings -- and I want to be sure that the summaries are allowed for the limited purpose -- the same limited purpose as before. These are not findings of fact in any way. This is just really to help everybody for discovery, to help people in the room understand what the Trustees and the Trustee's professionals are finding and where the case appears to be headed.

THE COURT: Well, are you tendering specific exhibits?

MR. GORDON: Well, all the exhibits -- as I understood it, the only exhibits that had objections you've already ruled on. Now I make these qualifications for the admission of

summaries that he referred to after those rulings and then any exhibits that he identified and testified without an objection earlier.

THE COURT: All right. So I have an exhibit and witness list summary or form AO187 and it's got in the movant or Trustee is Tiffany Caron and the exhibits are numbered T-1 through T-25. So is it your belief I have admitted all of those or ---

MR. GORDON: I think we excluded one that was ---

THE WITNESS: The one-page memo.

MR. GORDON: That one-page memo was not admitted. I can go back and look at what number that was.

MR. BANTER: I think you're referring to T-13. The email. Is that ---

MR. GORDON: That's it. 13 was not admitted.

THE COURT: All right. I can write on my copy; right? I have to get permission.

MR. GORDON: The exhibits I believe that Mr. Hays referred to started with number 12 and went through number 25.

THE COURT: All right. So T-1 through 11, those were admitted at our prior hearing? Is that correct?

MR. BANTER: No, Your Honor.

MR. GORDON: No.

THE COURT: All right. So ---

MR. BANTER: They weren't admitted at a prior hearing.

MR. GORDON: They're going to be used in other proceedings this afternoon.

THE COURT: Okay. Very good. All right. So T-12 through T-25 are admitted with the exception of T-13?

MR. GORDON: Correct.

THE COURT: Do you agree with that, Mr. Banter?

MR. BANTER: Your Honor, I agree with it notwithstanding our objections for the record.

THE COURT: Right.

MR. BANTER: Two, I believe the comment was made that these were all business records. I think some of the objections we had are that these are not business records. Of course, the other objections we made. Furthermore, Your Honor, to the extent these are summaries as we noted previously that the backup documentation for these summaries are supposed to be providing to opposing counsel to review before they are done. That wasn't done here, Your Honor, but for the sake of time we are stipulating these documents can move forward but under Rule 1009 we would ask that those copies of the backup documentation for all of the summaries be provided to us in a timely manner.

MR. GORDON: And that's agreeable, Your Honor.

THE COURT: All right. Then the Court will admit T-12 through T-25 exclusive of T-13, but I'll admonish counsel that it's for the limited purpose that we've use them today. If we

have an evidentiary hearing on any issue about an actual fact like what Mr. Feemster said to Mr. Hirsch, we can't have Mr. Hirsch here so we've got to have Mr. Feemster here. We're not going to rely on an email that somebody dumped in your box. Somebody is going to have to identify it.

The same thing goes for this general classification of these documents as business records. There's a set of four or five discrete questions that are asked to get that done as to each one and I am not going to gloss over those requirements if and when we get to those sort of evidentiary disputes. Right?

(Trustee's Exhibit Nos. 12, 14-25 are entered into evidence.)

MR. BANTER: And that would apply to all these exhibits, Your Honor?

THE COURT: Correct. Correct. They're -- in other words, you know, don't come back to me during some adversary trial and say, "Well, Judge, this comes in. You admitted it into evidence." I am admitting it in support of Mr. Hays' report which was beneficial to my, you know, ruling on and understanding the discovery disputes.

So it's pretty narrow right now, but you've done a good job, Mr. Gordon, of educating me about this idea of summary testimony and I'll study up on that and be -- you anticipate some kind of summary report at some later hearing?

MR. GORDON: I don't know when the Trustee will be

ready to do that. I think we are still pretty far away. We're really all dependent on Mr. Hays' efforts because we don't have the kind of ready source of books and records that we normally have. I mean, I've been involved in accounting -- accountant Ponzi scheme -- accounting firm Ponzi scheme cases and the books and records were meticulous. This is not like that.

THE COURT: Right.

MR. GORDON: It is very, very difficult.

THE COURT: Mr. Hays, let me ask you something. You mentioned the hallmarks of Ponzi schemes. So who has promulgated that sort of list that professionals like you look at?

THE WITNESS: There's a lot of court cases have law on what is the legal definition of a Ponzi scheme going back to the Charles Ponzi case in 1920 where it was more of a limited description of raising money with no business activity. The courts have expanded the role, the legal definition of a Ponzi scheme. In fact, I wrote about a seven- or eight-page article on the legal definition of a Ponzi scheme that includes the 10 or 15 different factors that courts have looked at. I'll be happy to share that article with you. It goes through all the legal definitions of a Ponzi scheme. A lot of courts after the Madoff case began to expand the definition of a Ponzi scheme to call it a Ponzi-like scheme and Ponzi-type scheme. The word became a lot more common after the Madoff case and so it's more

of a broader definition.

In this case it fits really the typical case of a Ponzi scheme where there is really little business activity. I mean, when I talk about from 2008 forward, there is very little activity and there is a friend of mine that wrote a book that's a 900-page book that's called The Ponzi Book and -- Kathy Phelps wrote the book.

MR. GORDON: Co-authored it with Judge Steve Rhodes, the Detroit -- City of Detroit Bankruptcy Judge. They co-authored it.

THE WITNESS: It is a 900-page treatise on Ponzi schemes and a lot of those Ponzi-type characteristics are included in that report and I reference her book when I do a Ponzi expert report and characteristics of a Ponzi scheme. This case has, basically, all the characteristics of a Ponzi scheme. The only exception is the payment of sales commissions. Usually, you see very high sales commissions in these type of cases and he didn't pay any ---

MR. GORDON: Well, you don't see them in affinity frauds like you do in non-affinity frauds because the investors are attracted through already their trust level and knowledge of the person whereas in none affinity they are paying other people to bring in the investors and that's why you see those outlandish commissions in those type. I have been involved in a lot of these, too. We both have.

THE COURT: All right. I don't want to cut you off. There's other material you want to cover today, but I had just kind of a general inquiry for counsel for the Trustee. I am thinking of the end game here. So in a typical Chapter 7 case it's the Trustee's obligation to find assets of the estate, liquidate them, convert them to cash and pay creditors. So we all know that 40 million-dollars in claims have been filed and there may be 5 million-dollar insurance policy. There may be a $988,000 in somebody's bank account, but so do you hold out the possibility that somewhere hidden is some of this money in a secret asset or account that you hope to discover or is it your belief that that money is more or less evaporated, however that happens in a Ponzi?

MR. GORDON: Well, we don't know precisely, and, although we've talked about it among ourselves what we think may have happened, I don't want to say it in court. I don't feel --

THE COURT: That's fine.

MR. GORDON: -- strongly enough about it yet.

THE COURT: All right. So my view of it is, you know, you identify what few assets you can get your hands on. You look around and see if there is any hidden assets, and not to put a wet blanket on everybody and, you know, upset people, but Hirsch & Tucker is a professional corporation and it presumably has liability insurance.

MR. GORDON: Minimal.

THE COURT: Well, I assume that if it has that its counsel would have advised its principals to reach out to that liability carrier and at least put them on notice of the potential of claims because one thing that can happen is the liability carriers can say, "Wait a minute. This has been going on for five years. You didn't tell me anything about this. We're not paying a nickel." Any law firm that touched this file even remotely probably ought to do the same thing. Not to be -- you know, not to put everybody in a bad mood, but that's the potential source of recovery and I don't know if that's something that you are pursuing.

MR. GORDON: Well, I mean, counsel for Hirsch & Tucker is here and we're dealing with this issue some time ago because at least one of the large investors directly went after Hirsch & Tucker and made demand and we interceded and I think the last I heard was that the insurance company made the decision not to pay out the policy limits which were relatively minimal.

MR. BRENNAN: That's right. There was a policy limits demand, a hold demand as tort lawyers like to call it, for the entire $250,000 in liability insurance and that --

THE COURT: Wow.

MR. BRENNAN: -- request was rejected. Hirsch & Tucker is currently being sued by one investor. They've gotten a demand letter from another investor, similar type of demand.

So they're in active litigation. I don't represent them in that, but the insurance company is providing counsel, you know, directly through that lawsuit.

THE COURT: All right. So that's, you know, that's an unpleasant subject for we professionals to think about. You know, I got sued. I'm pretty sure my company paid a claim or two over the years, not necessarily anything I did, but it's an unpleasant reality, but now I want to ask about an even more unpleasant reality and that is if Mr. Hays' efforts develop that there is, in fact, a full blown Ponzi scheme at least in the last, you know, 2013 -- maybe it started out legitimately. Maybe in the end it was all just collecting money to pay other investors. Is it the case that the Trustee views the look back period for conveyances that can be set aside to be a fairly lengthy period?

MR. GORDON: Well, the -- I knew you were going to give to avoidance issues in this discussion, but the -- there are -- there was around or possibly two distributions during the 90-day period. It just depends on when the check cleared from the farther distant one. Some may be on one side of the 90-day line and one on the other. There -- in a Ponzi scheme there is no ordinary course of business exception. It's disregarded because that is -- cannot be the ordinary course of business, but so there is the preference issue and there you're talking about at most a few hundred thousand dollars allottable

money to the investors but not for the obligations that this estate is going to incur.

In terms of the look-back period that you're referring to, there is the discovery point that begins the reach back so that you're not limited to the normal four year or if you have a federal creditor possibly six years or more, but that's probably what would kick in here and the claims have to be looked at if there is a reason to. If we don't make recoveries and there is not going to be distribution, there is no reason to spend a lot of time going through claims, but claims will have to be resolved among net winners and net losers and things like that.

That's just what happens in these Ponzi scheme cases, but only if there is a benefit to be served. If -- there is no point in running up fees to do that to make no distribution anyhow if that's where this ends up and I know Mr. Hays is frustrated, too, because everybody is putting in a lot of time and we have no real money in the estate to show for the efforts to date and a lot of opposition everywhere we turn. So it's very, very difficult and I think it's going to be a long haul and I know that my firm is committed to representing the Trustee for as long as needed regardless of the ultimate outcome.

THE COURT: Well, what's interesting to me about this case is I haven't studied the claims register, but my

recollection is that 99 percent of the creditors are the investor victims. All right? So, if the liability insurance that I alluded to is nominal and it's paid in and, you know, people just don't want to fight over that, they say, "Yeah, we touched the file, you know, here is our million-dollar liability, 100,000, or whatever it is," and if you determine after your discovery there is no hidden money at all -- it is just all gone -- and then it's just a question of whether you take these $40 million in claimants and you reshuffle the dollars based on net winners and losers, as you call it, and create this pool of money. Then, you know, at Mr. Hays' hourly rate, your hourly rate, a huge chunk of it is just going to go. Then you'll have a net pool of money that will be redistributed pro-rata among the people that paid in.

MR. GORDON: The net losers. Among the net losers.

THE COURT: Right.

MR. GORDON: But it would still be a sizable distribution most likely, but the -- but the -- honestly, I have not had one that's able -- a lot of these cases started out looking bad. I haven't had one yet where we didn't find substantial amounts of money. Usually, they make their way to insiders or inside entities. That's where the money usually ends up and we have to pursue that and that's why everybody is resisting everything we do because that's where these investigations usually come out and I'm not saying -- because

we don't know for a fact, I am not saying that that is the case here. I am just saying that is typically what is the situation. This may be an entirely different situation all together when we get right down to it and if it is, then it is.

THE COURT: Well, you know, one of the things that I think about this case is, you know, I studied the docket. I studied what few documents were produced at the last hearing and, you know, from my perspective I have no idea what happened, where the money went. I would have expected by now to hear some testimony by an investor who says, "Well, this is the sales pitch that I got," but I'm coming to believe that maybe there was no sales pitch. It was just one friend says to another, "Hey, I'm in. Why don't you get in?"

MR. GORDON: That's the affinity fraud nature. I mean, that's why -- this one is a double affinity because mostly the investors are members of the same congregation. That's one affinity and a lot of them are also clients of the accounting firm. That's a second affinity. This is the first time I have had a double affinity. That makes the sales pitch and the need not a factor so much and neither is the need for a commission to pay other people to bring in investors because it's not necessary. So those are -- those are elements that you often see that are not necessary and won't be found here.

THE COURT: Right. And so just so everyone understands my perspective on discovery, to avoid the tragic

result that the only money the Trustee can find is clawing back from the victims and redistributing among the victims -- to avoid that tragic result, I'm going to err on liberal discovery that would allow, you know, you to trace where this money went. I mean, you say this man in Arkansas returned 15 million. That kind of -- the fact that he gave 15 million back makes me suspicious about why that was so easy. You know what I mean?

MR. GORDON: And that was 10 years ago, but it was ---

THE COURT: Well, maybe some of it's ---

THE WITNESS: Well, it wasn't exactly easy. He went through a long, protracted divorce and she had the money and so ---

THE COURT: All right. In any event, just so you'll understand my perspective, I am trying to get to the bottom of where the money went. I appreciate, you know, the need to protect attorney-client privilege, to segregate Mrs. Hirsch's property from the debtor's property, but that question in and of itself is not necessarily one that's easy to fathom. So, in any event -- all right. So we've covered a lot of the material on the docket. I want to -- not to cut you off, but I want to turn to the motion for turnover of property. This appears at Docket 140.

MR. JONES: Your Honor --

THE COURT: Yes, sir?

MR. JONES: -- I hate to interrupt and I just don't

know if this is the appropriate time. I did have just a few cross examination questions.

THE COURT: Yes, please. Thank you for correcting me.

MR. JONES: I know lawyers are famous for saying "just a couple of questions," Your Honor. So I actually counted mine and I have eight, but I am sure I can turn that into a couple more or will be hard pressed not to turn it into a couple of more.

THE COURT: Mr. Jones, I'm so used to asking all the questions it never occurred to me there might be one or two left.

MR. JONES: No. Thank you, Your Honor. I appreciate the questions that your court -- that the Court did ask. So this was --

THE COURT: Go ahead.

MR. JONES: -- was actually my last question, but I'll move it to the front because it picks up on Your Honor's question.

**CROSS EXAMINATION**

BY MR. JONES:

Q If you could, Mr. Hays, turn to your Exhibit 21 that the Court just introduced into evidence. I'm sorry -- admitted into evidence. And, for the record, Mr. Hays, while you're looking, you and I have known each other for quite a number of years. I think you said 20 at least; is that correct?

A At least 30.
Q At least 30. Thank you. I think that's a closer number. And you know which one you're looking for?
A I really don't.
Q All right. It is that one.
A I've got it, yeah.
Q Okay. If you could turn to page three of three. Do you see that?
A Got it.
Q And then you see the line that's about -- after "Description" there is a line that says "Investor sum of receipts, 32,185,215". Do you see that?
A Right.
Q And then over sum of payments do you see the number $53,120,720?
A I've got that.
Q Okay. So this shows that MLG received from investors about 32.1 million; is that correct?
A That's correct.
Q But it paid -- but MLG paid out to investors about 53.1 million; is that correct?
A Again, this is stamped preliminary prepared based upon available information. I don't have all the wires in here from all the investors. There are -- I've got down below -- you'll see at the very bottom of that page I have "Researching". So

that might answer your question. Twelve point two million. I have wires coming in that I don't know. So I assume that's coming in from investors.

Q Okay. All right.

A I think that answers your question.

Q All right. Thank you very much. I certainly understand your qualification that this is a work in progress, but what I think I heard you say is that there's 12 million in receipts that you have not accounted for; is that correct?

A That's what I am talking about. I call it researching here at the bottom.

Q All right. So even if you add that 12 million and assume it is all investor money coming in, then that puts the sum of investor receipts at 44 million; is that correct?

A That's correct.

Q And then so still after that MLG paid out to the investors what you have seen so far on a preliminary basis at least 53 million; is that correct?

A That's correct.

Q Okay. So there is actually more money going out to investors than ever came in based on your preliminary Investigation as of right now; is that correct?

A No. You're very preliminary and I don't have all the information in here, but --

Q But, yes?

A -- based on what you just said, yes.

THE COURT: Well, why would there be $40 million in claims?

THE WITNESS: This is all still very preliminary. He also needs to pick up the 4 million that I had researching going out that I don't have in there. So, you know, it could -- something could be miscoded in here where I received it.

Q But isn't it -- don't you think, Mr. Hays, that the amount of the claims could be based upon the investor's expectation of receiving these high interest rates; is that correct? And that maybe the investors filed claims based on what they thought they were going to receive versus what they actually paid in and paid out; is that right?

A They were -- the investors were being paid between 12 and 15 percent and so that, as I mentioned earlier, that was close to four to 5 million a year.

Q So the investors could be filing claims and you would expect them to file claims what they thought they were going to get out of this, not based on what they actually did get, win or lose, to use Mr. Gordon's terminology?

A Well, the claims are, basically, the principal that they put in because they were paid interest on a routine basis.

Q Okay. But you don't know that because you haven't researched the claims yet?

A I've scanned a lot of the claims, but I haven't been

through every one of them and reconciled it to the money coming in.
Q Okay.
A Most of the money going out -- some investors were paid off. You know, I started 2011. So it's not -- we don't have the full deck here.
Q Right. But based on your preliminary review you have some of the investors listed here and you're trying to show here net winners and net losers based on the amount of money owed and the amount of money ---
A I wasn't really trying to show that -- net winners and losers -- here.
Q All right.
A That's a much further analysis.
Q Okay. So we don't have Mr. -- the analysis to back up Mr. Gordon's comments about net winners and net losers?
A Well, he doesn't give you any specific facts. He just mentioned that it is a possibility that that would be a very detailed analysis that would take a lot of time. Once you had all the wires, once you had all the other accounts, once you reconciled the investors, that would take some time to get to.
Q Understood. When you haven't been able to account for the $12 million in wires coming in, you don't know who is a net winner and a net loser yet?
A That's correct.

Q All right. Fair enough. Now this was going to be my first question, but your work involves financial and tax-related investigations as you described; is that correct?
A Right.
Q And you are familiar, aren't you, Mr. Hays, with the terms "innocent spouse" with respect to tax liabilities, aren't you?
A I'm aware of the term. Yes, sir.
Q Okay. And based on your investigation of the financial affairs of Master Lending to date -- and we understand it's preliminary -- you have not found any evidence that Judy Hirsch was anything other than an innocent spouse with respect to the affairs of Master Lending, have you?
A Well, I have a lot of questions about the beach house that she wound up with and we haven't talked about that yet.
Q All right. Let me ask you this. You -- that's speculation on your part because you say you have a question about it; is that correct?
A I said I had a question about it.
Q Okay. So you don't have any evidence, sir, of any act by Mrs. Hirsch which would cause her to be anything other than an innocent spouse as you sit here today, do you?
A I have money wired to a check to her for $110,000.
Q That is correct and I am going to ask you about that. Other than that one payment -- well, let's look at it. Okay. Page one on Exhibit 21. You see about six lines down where it

says Judy Hirsch?
A Judy Hirsch. Okay.
Q All right. So you have found to date $55,000 with respect to Judy Hirsch coming in; is that right?
A That's correct.
Q And you have found $117,500 going out; is that correct?
A That's correct.
Q And that 117,000 includes check number 1637 which is part of your Exhibit 16, doesn't it? That's the one you testified to earlier?
A About 110,000 right. So there is another check for ---
Q So other than these numbers right here on page one of three on your Exhibit 21 you haven't found any money going to or from Judy Hirsch, have you, to date based on your preliminary investigation? That's a yes or no.
A What I found ---
Q That's a yes or no.
A What I have found --
Q Yes or no.
A -- is right here on this piece of paper.
Q Right. So you haven't found anything else; is that correct?
A Well, we're going to have to go over and look at another schedule. Hold on. Hold on, sir. I don't know if I have that exhibit --

Q All right.

A -- of the transfer.

Q Let me ask you this, Mr. Hays. With respect to the transfers that you have identified and testified to before the Court today involving Judy Hirsch which is the $55,000 in and the $117,500 out, with respect to those monies, you don't know why those monies were paid or received as you sit here today, do you?

A That's correct.

MR. JONES: No further questions. Wait. I might have one more. One further question after having conferred.

If you would turn to tab 16, Mr. Hays and look at the check number 1637 which you said earlier was paid to I think somebody other than Judy Hirsch, but this is the one you're testifying went to Judy Hirsch as you sit here now; is that correct? Do you see it dated November 10?

A It is a Master Lending check number 1637 payable to Judy Hirsch for $110,000.

Q You don't know what Judy Hirsch's signature looks like, do you?

A No, I don't.

Q So you don't know if that's her endorsement on the bottom of that check, do you?

A I do not know.

Q Thank you.

THE COURT: Any other questions?

MR. BANTER: Your Honor, I have a few questions.

THE COURT: Yes, sir, please.

**CROSS EXAMINATION**

BY MR. BANTER:

Q Mr. Hays, you testified earlier that you examined an Excel sheet that referenced insurance policies; correct?

A That's correct.

Q And that was part of your analysis to make the conclusions of your preliminary report; is that correct?

A I reviewed it. I don't think I totally relied on it other than to say that it's a source of unknown money what was used to pay for those premiums.

Q On that Excel sheet -- that Excel sheet listed several insurance policies; correct?

A It's about 20, as I recall.

Q Master Lending was never the owner listed for any of those insurance policies; correct? I believe that's your Exhibit T-7. I'll rephrase the question. If you look at column number it looks like four, it says "Owner". Do you see that?

A The owner. Okay.

Q Master Lending Group which is the debtor here is never listed as the owner of any of those policies in that column; is that correct?

A That's correct.

Q If you look at the next column which would be column number five -- "Beneficiary" -- Master Lending is not listed as the beneficiary in these policies; is that correct?

A That's correct.

Q And you do not know -- at this point in your preliminary report you do not know who paid the premiums for any of these insurance policies; is that correct?

A I'm looking at the third to the last column -- "Premium". This is a very poor schedule to read. The premium - there's the check numbers that are written and I ---

Q Do you see Master Lending Group?

A I don't see Master Lending, but I do think if we go back to my Exhibit 21 and if you look over -- under page three of three where I have "Other" and these are things that I have ---

Q I'm sorry. Which exhibit?

A Exhibit 21, page three of three. It's not much money. So we don't need to waste a lot of time, but under insurance I've got today I've got New York Life and being paid $4,000 and Universal PNC paid 2400. Again, I've got 12 million in my unknown column. I have 4.3 million paid out that I don't know where it went.

Q And that's to New York Life and Universal PNC. But, again, you would agree with me that Master Lending Group is neither listed as the owner or beneficiary under Exhibit T-7; is that correct?

A That's correct, but they likely have been the payor.
Q Based on what evidence?
A Well, I see -- I've got two insurance companies that were paid here out of Master Lending. I've got 3.2 million going to Hirsch and Company. I don't know exactly how that life insurance was paid for.
Q All right. But they're not listed as the beneficiary; correct?
A That's correct.

MR. BANTER: No further questions, Your Honor.

THE COURT: Anyone else have questions for Mr. Hays?

All right. Mr. Hays, you can stand down. Thank you.

All right. We have on the calendar a motion for turnover.

Elizabeth, you need a break? You need a break?

Let's take a break. Let's take a recess.

(A break is taken.)

THE COURT: All right. Counsel, it was my intention to turn to the motion for turnover unless there was other business that needed to be heard first.

MR. GORDON: Your Honor, there was another matter -- a motion to strike -- and I don't know that one needs to come before the other, but I asked various parties involved if they had a preference. I don't know if people had to get home or their schedules and I think there was a consensus to handle the

motion to strike first.

THE COURT: That's fine. I mean, I reviewed it. It has to do with amendments to the schedules without wet ink signatures or authority or just knowledge.

MR. GORDON: Well, this has to do with the -- the set of amendments that were filed by the executor of the Gregory Hirsch estate.

THE COURT: Right. So I'm familiar with a motion to strike pleadings in a -- you know, an adversary or other civil complaint where you allege inflammatory matter or whatever the words are, but in the context of schedules I have never seen a motion to strike and I'm not sure of the need for it. I mean, what's in the schedules doesn't make it true. We all know that whoever filed them didn't know what the heck they were talking about. So, I mean, what would be the point? And how would you -- who would you call upon to undo them? What lawyer wants to step forward and say, "Okay. I will now file a truthful document in the schedules without any information"? I mean, it's like a ---

MR. GORDON: Your point is well taken, Your Honor. The only document that we're trying to strike is Docket No. 162, the fourth amended schedules, and if it's stricken, then we have the original. We have the original schedules is what's there. We don't need any further amendment to it and -- because there is nobody to make the amendment. The problem we

have which I'm prepared to demonstrate is that the party that did prepare them had a really overt conflict of interest and shouldn't be filing anything in this case and that's the problem that we have and ---

THE COURT: And who was that?

MR. GORDON: The executor who is here in the courtroom who signed off on this amended -- fourth amended schedule that was filed on October 23 of this year and ---

THE COURT: With a world class disclaimer that looks like a Wall Street lawyer prepared it. I mean ---

MR. GORDON: Very much so.

THE COURT: -- he is saying, "I'm filing this, but, you know, I don't know where the information came from." I mean, to me it's a meaningless amendment because it doesn't create an asset. It doesn't disappear an asset. It is just somebody trying to clean up an obvious or perceived inaccuracy, but whatever the assets of the debtor are, they are, and none of us are going to let the schedules dictate that.

Now it could be that the debtor is, you know, precluded from, you know, by estoppel from arguing otherwise, but, I mean, you're the debtor now. I mean, Ms. Caron is the debtor.

MR. GORDON: It is really preemptive as much as anything else because it wouldn't take very long, but the conflict is so direct -- the conflict of interest -- that we

don't want this person filing papers on behalf of the debtor. The executor of Gregory Hirsch whose disclaimer makes it clear knows nothing about the case but who clearly has not read -- if he's standing in the shoes as a member of the LLC that's in bankruptcy, he's clearly never read the Operating Agreement of the Master Lending Group, LLC or he wouldn't have dared to file this.

THE COURT: All right. Well, let's do this. It's your motion. Tell me about your motion and if you want to put up evidence, I'm glad to hear it. I mean, I've read it, but ---

MR. GORDON: Well, may I just have the person who signed -- this is Mr. Ratcliffe, I believe, is his name as the executor. May I have him come to the witness stand?

THE COURT: Absolutely.

Mr. Ratcliffe in the courtroom?

MR. RATCLIFFE: Yes, sir.

THE COURT: Please come forward.

MR. GORDON: Excuse me. I made a mess with these exhibits.

MR. RATCLIFFE: Good evening, Your Honor.

THE COURT: Good to see you. You need to be sworn.

(Thomas J. Ratcliffe is duly sworn.)

MR. GORDON: And I want to make it clear that I'm calling Mr. Ratcliffe for purposes of cross examination, Your

Honor.

THE COURT: And counsel for the estate is Mr. Banter and Ms. Hall? Right?

MS. HALL: Yes, Your Honor.

MR. BANTER: Yes, sir.

THE COURT: Do you have counsel?

MR. RATCLIFFE: No, sir. They are counsel for the estate.

THE COURT: Okay. Independent counsel. Okay. Very good. Thank you. I thought Mr. Tim was here whose last name escapes me.

MS. HALL: Mr. Roberts represents Judith Hirsch.

THE COURT: Okay.

MS. HALL: And, Your Honor, we would just note that Mr. Ratcliffe is not listed on the Trustee's list of witnesses; however, to not belabor the point, we'll just note that for the record.

THE COURT: Okay.

**CROSS EXAMINATION**

BY MR. GORDON:

Q Mr. Ratcliffe, please state your name and spell it for the Court.

A Thomas J. Ratcliffe. R-A-T-C-L-I-F-F-E.

Q And, Mr. Ratcliffe, what is your profession or occupation?

A I'm a lawyer.

Q And have you been a member of the bar for decades?
A Yes.
Q And what was the position that you hold -- I believe it's executor, is it not? -- in the probate estate of Gregory M. Hirsch?
A Appointed the administrator of that ---
Q Administrator?
A Yes.
Q All right.
A With the will annex.
Q Are you a regular county administrator?
A I am. In Liberty County.
Q For those of us not from this area, what's the county seat of Liberty so I'll know where it is?
A Hinesville.
Q Hinesville. And as the administrator of the Gregory M. Hirsch estate you -- that is a position, I believe, you have held as administrator for other estates as well?
A I have.
Q Have you ever been responsible for a bankruptcy case where you were administrator?
A You know, I don't think I have.
Q And are you familiar with the Georgia Supreme Court case of Ringer v. Lockhart from 1977? Do you know that offhand?
A I don't.

Q It's fine. It just says, "An executor or administrator" -- and let me just quote -- "solemn trust is to manage the estate under his control to the best advantage of those interested in it." Does that sound correct to you?

A That's part of that duty, yeah.

Q And normally -- normally, a life insurance policy passes outside of probate, doesn't it, unless the beneficiary is the probate estate itself?

A That's correct unless the estate is the beneficiary.

Q And in your capacity as the administrator of Gregory M. Hirsch's probate estate you assumed the role of being the member of Master Lending Group, LLC where he was previously the sole member?

A It is my understanding he was the sole member; yes.

Q And you filed an amendment which we referred to as Document No. 162 where you have this as the Court just a few minutes ago referred to it as a rather massive disclaimer, but in your amendment you removed from the bankruptcy estate -- you removed from the bankruptcy estate a life insurance policy in that amendment and, essentially, took that out and on what authority or basis did you do that since the life insurance policy was not even in the probate estate?

MR. JONES: Objection to the form of the question, Your Honor. Mr. Gordon just stated in the question that the schedule somehow removed an asset from the estate which the

Court already noted the schedules are not the determination of whether property is or is not property of the estate. So I object to the form of the question.

THE COURT: All right.

MR. GORDON: Well, I think ---

MR. JONES: It presents a legal conclusion and it's actually a falsity.

MR. GORDON: Well, actually, the form is correct, Your Honor. I am using the term "remove" in the generic sense. It was there and then it was not when he filed the amendment. In other words, it was literally removed. Maybe I shouldn't have said it was an asset, but it was removed from the schedules -- the life insurance policy.

MR. JONES: Your Honor, that is correct. If he phrases the question that way, it might be a more appropriate question, but Mr. Gordon phrased the question saying that it was -- the policy was removed from the estate.

MR. GORDON: I'll rephrase it.

THE COURT: Please rephrase it.

I sustain your objection, Mr. Jones.

Please rephrase.

MR. JONES: Thank you, Your Honor.

Q The amendment that you filed ---

A Yes.

Q The amendment that you filed removed a life insurance

policy that had been listed in the bankruptcy. Do you recall doing that?
A Yes, sir.
Q And that life insurance policy was not part of the probate estate, was it?
A No, it was not.
Q And so for whose benefit was that amendment that you filed?
A I believe that it was a series that Mr. Hill had made earlier amendments of a similar nature but that they were being withdrawn. I understood myself as the estate administrator as the only proper party to sign in that once Greg Hirsch was deceased.
Q And that's even though you acknowledged that the life insurance policy was not part of the Greg Hirsch probate estate?
A I looked at the -- well, I don't know that it didn't altogether -- not part of the estate. My review of the policy indicated that the ownership of the policy was in Greg Hirsch and the beneficiary of the policy was not Master Lending or the bankrupt -- that bankrupt had no interest in the policy that I could see on the four corners of the document. So it appeared to me that it was okay to remove it from the schedule.
Q Well, did somebody advise you of that that knows something about bankruptcy?
MR. JONES: Objection.

THE WITNESS: I certainly had advice from counsel.

MR. GORDON: I'm sorry. What? I couldn't hear. I see him standing, but I thought I heard ---

MR. BANTER: I think Mr. Jones made an objection. I make an objection on behalf of my client to any advice that we gave him directly for attorney-client privilege, Your Honor.

MR. GORDON: Well, he is an attorney himself.

MR. BANTER: He is also our client, Your Honor.

THE COURT: All right. First of all, the question was did you receive any advice and you've objected to that.

MR. BANTER: Yes, Your Honor.

THE COURT: Not the nature of the advice, but just whether he got any advice?

MR. GORDON: That's what I was asking.

THE WITNESS: I did. I did.

MR. BANTER: Your Honor, we allow him to answer the question did he receive advice, not the substance and nature of the advice.

THE COURT: All right. I'll allow the question of whether you received any advice and you don't have to disclose what the advice was.

THE WITNESS: Yes, sir.

Q Did you independently investigate the propriety of the advice you were given?

A Yes.

Q And you filed this as the member in replace of the deceased, Gregory M. Hirsch, as the sole member of Master Lending Group, LLC; correct?
A That's the capacity under which I understood I was signing, yes.
Q And have you ever read the Operating Agreement for Master Lending Group, LLC?
A I have had the opportunity to see it, yes, sir.
Q Had you read it before you filed that amendment?
A I think, but I am not certain.
Q You're not certain?
A At ---
Q Let me show you what is marked ---
THE COURT: Were you finished with your answer?
THE WITNESS: No, sir. That's fine. Yes, sir.
Q This is Exhibit T-5. "T" just stands for Trustee. Do you recognize that as the Operating Declaration of Master Lending Group, LLC?
A It is.
Q I'll wait for you to put your glasses on.
A That's what it purports to be.
Q Okay. Now I want you to read the first sentence of paragraph number three -- the very first sentence -- out loud.
A "Purpose of business shall be to engage in any lawful activity in furtherance ---

Q No. Just the first sentence. Did you ever make a determination that the activities of this company had been lawful, were not lawful? Did you ever do that?

MR. JONES: Objection, Your Honor. I don't see how this is relevant to the signing of the schedule.

MR. GORDON: I'm getting to that.

MR. JONES: So it's a relevancy objection.

MR. GORDON: I'm getting to that.

THE COURT: How is it relevant?

MR. GORDON: Well, along with the other questions I am going to ask it's going to show that he can't be doing this in the capacity that he purports to hold.

THE COURT: All right. I'll allow the question.

Q I want you now to go to paragraph five and read the first sentence of paragraph five on the next page entitled "Titled Company Property" out loud.

A "All property owned by the company" -- is that the sentence? -- "by the company and insofar as permitted by the law the member shall have no ownership interest in the property."

Q "The member shall have no ownership interest in the property." Have you made any determination of whether the member, Gregory Hirsch, obtained an ownership interest in any of the company's property in your capacity as either the member now or as the administrator of his estate?

A Would you ask your question again, please?
Q I beg your pardon?
A I want to understand your question.
Q Have you made any determination of whether the member, Gregory Hirsch -- now former member -- had obtained an ownership interest in any of the company's property either in your capacity as administrator of his probate estate or the current member of the LLC?
A He would not have had an interest.
Q That's a yes or no question.
A Have I done what?
Q Have you made any determination ---
A No.
Q Okay.
A I have not made a determination.
Q And for you to make that determination you don't view that as a direct conflict with the interest of the company if the member did something contrary to the membership agreement of the company? You don't know?
A I can't tell you the answer to that.
Q All right. Let's keep going. Look at paragraph 6C entitled "Compensation".
A Okay.
Q All right. Can you read that one sentence?
A "Compensation. The member for its management duties shall

be fixed from time to time by the member absent which the member will serve without compensation."
Q Have you ever seen a compensation agreement in connection with the former member, Gregory Hirsch, and this LLC company?
A I have not.
Q Have you made any investigation into that?
A I have not.
Q Okay. Let's go to paragraph 10 on the next page entitled, "Books and Records". Can you read the first sentence under 10A, "Availability"?
A The first sentence says, "At all times during the existence of the company the member shall keep or cause to be kept complete and accurate books and records appropriate and adequate for the company's business."
Q And have you -- have you determined where these complete and accurate business -- rather, books and records are? Have you determined that? Have you looked for them?
A Well, I think I have begun that process.
Q And what have you done in terms of beginning that process?
A Well, that's kind of like saying as we say in the south "I'm fixing to" which doesn't mean that -- I think that, among other things, we're looking to understand what the interest of all of the holdings -- well, let me back up and say this. Maybe this would focus the question. It would be my fiduciary assignment for the probate court to marshal the assets that

belong to Gregory Hirsch. That would include whatever comes out of this bankruptcy if, indeed, anything ever came out of the bankruptcy that belonged to him.

Q All right.

A But this is not the only entity, sir, that in my very limited course I've discovered there are a number of entities that existed, and, quite frankly, we've listened to testimony for a good portion of this afternoon about a very sophisticated gentleman whose been trying to figure that same question out. I'm in the very same boat he's in. I'm trying to figure out for the probate court and then finally to make an inventory of what those assets were, but I don't tell you that I've spent much time with Master Lending for the reason that there are enough lawyers in this room now involved in that it would seem to me that you'll do a good job of telling me what is there when and if I can discover it. My reason for being here this afternoon is so that I might see you guys work for a little while and see what I learn that Judge Bordeaux may find helpful when we get to that issue.

Q Is Judge Bordeaux the probate judge?

A Yes.

Q So you're fixing, I think was the term used, to start looking for the complete and accurate books and records?

A Well, I can look for the books and records and I would tell you, not to embarrass anybody who is here, but the beginning of

that for me would be at Hirsch & Tucker where I've got to deal, frankly, with the liquidation of his interest in that partnership.
Q And are you ---
A But I'm having a little difficulty getting an immediate response with the understanding because counsel represents Hirsch & Tucker. You've made an overture on behalf of the Trustee to now discover records and you've got control of them. I'm not sure that I can define what his interest is yet, but I'm sure that in time we'll know what it is.
Q Are you aware that the books and records of the company belong to the Trustee -- the bankruptcy Trustee?
A Well, I do understand that and I think you've gone and gotten them if I understood the testimony I listened to this afternoon.
Q The test ---
A You've got everything that Hirsch & Tucker has got that had Master Lending's name on it --
Q I ---
A -- or that might have had the name on it.
Q I don't want to say that you misheard, but we're still looking for complete and accurate books and records. That's --
A Well ---
Q -- the struggle.
A -- I don't know, but ---

Q But ---

A -- that would be where I would go --

Q All right.

A -- and I've made that overture and have reached out to them for that purpose.

Q Now look at number B ---

THE COURT: Mr. Gordon, let me interrupt. Not to -- Mr. Ratcliffe, I understood you to say that you're just in the beginning stages of understanding the scope of Mr. Hirsch's property interest.

THE WITNESS: Yes, sir.

THE COURT: And that, you know, you want to investigate his interest in an accounting firm and that sort of thing. Why was it so important for you to run in and make these two very narrow amendments to the schedules deleting or attempting to delete from the schedules this life insurance policy and this money in a bank account? It was like low hanging fruit that right away that got your attention.

THE WITNESS: That was not my first mission or first act, but let me answer the question you asked me, sir. It was my understanding from representations and discussions with Jud Hill that there was a problem with the schedule's amendments that had previously been tendered. Everybody was of a mind to correct and make those amendments proper for this court. Now that involved someone having to sign then for the company. I,

being the administrator of the deceased member's estate, was the logical person to sign it.

THE COURT: All right. To sign, but who decided to focus on this amendment deleting from the schedules these two assets?

THE WITNESS: My recollection -- and I could be incorrect because I don't pretend to know everything that's been filed in the bankruptcy court, but I think the previous amendments would have accomplished the very same thing, but the problem was with the signatory on the amendments. So I was not going out of the bounds of whatever was the intended amendment. It was just not completed technically in a correct way.

THE COURT: All right.

Q So before you did that, did you go back and look at the original schedules that had been filed --

A Yes, sir.

Q -- under the penalty of perjury?

A I got them and ---

Q And you saw ---

A -- and looked at them. I ---

Q And you saw --

A -- took advice --

Q -- the life insurance policy listed?

A -- took advice, had representation from judges to ---

Q Listen to the question. When you went and looked at the

original schedules you saw that that life insurance policy was listed?

A And had been removed.

Q No. I'm talking about in the original schedules. It was listed?

A Oh, I didn't look at the very, very original schedule. I looked at the amendments that were previously made.

Q So you weren't aware that it was listed. Mrs. Hirsch, under power of attorney, is the one who signed and Mr. Hill was the attorney for the company that filed them, but it was listed with an equitable interest. Are you familiar with equitable interest in bankruptcy?

A I won't tell you that I'm an expert on that.

Q It's okay if you're not.

A I know what equitable interests are.

Q It's okay if you're not. Even some bankruptcy lawyers aren't familiar with it.

A Well ---

Q I am not trying to embarrass you.

A No, no, and I don't feel embarrassed or harassed.

Q So you didn't investigate whether the estate had an equitable interest before you did that amendment, did you?

A I didn't attempt to do that. No, sir.

Q And you didn't speak to the Trustee about it -- Trustee for MLG, the company?

A No, sir, I did not.
Q And have you ever spoken before today to the Trustee, the bankruptcy Trustee?
A Have not.
Q So you filed that without having even spoken to the bankruptcy Trustee. All right. Are you aware that the bankruptcy Trustee is the lawful representative of the company?
A I think that would be the case. That's my memory of bankruptcy.
Q But you didn't speak to her?
A I did not.
Q All right. Now go to the -- I'm going to skip ---
A But, but, you do recall --
Q What?
A -- the company had counsel and it was the company's schedule that I was amending.
Q Now go to 10B which is reports. 10B.
A Oh, I'm sorry.
Q And it is just one sentence long. Would you read that?
A "Member shall cause to be produced a profit and loss statement and a balance sheet as of the end of each fiscal year."
Q Now have you seen these -- a profit and loss statement or the balance sheet -- for the company that the member was required to prepare?

A I don't know that they exist.
Q I take it that's a, no, you have not seen it?
A No, sir, I haven't seen them.
Q All right. And to the next -- go down to "D", "Depositories". Tell me when you see that long paragraph. You don't have to read it, but do you see "Depositories"? It is "D" -- 10-D near the bottom of the page.
A Yes, sir.
Q It says, "The accounts of the company" -- and I am jumping to the bottom couple of sentences -- "shall be bonded under a blanket commercial bond insuring the company against loss." Have you determined that there is any such blanket commercial bond in existence?
A I don't know of any such bond, but then I -- you know, I don't know.
Q Now go to the next page, the last page of the document called "Liquidation of Property and Application of Proceeds".
A I do remember that paragraph.
Q All right. Now I'll save time. I'll read it. Just read along with me. "Winding up. Upon the dissolution of the company the member shall wind up the company's affairs in accordance with the act. In winding up the affairs of the company the member" -- this is their typo, not mine -- "the member are authorized to take any and all actions contemplated by the act as permissible including without limitation, one,

prosecuting and defending suits, whether civil, criminal or administrative; two, settling and closing the company's business; three, liquidating, reducing to cash the property as promptly as is consistent with obtaining its value; four, discharging or making reasonable provision for the company's liabilities; and, five, distributing the proceeds of liquidation in any undisposed property."

Do you see all that? Yeah? And are you aware that those are the duties of the bankruptcy Trustee -- not you? The duties of the bankruptcy Trustee?

A You know, I think that would be the duty at this point.

Q Because there is a bankruptcy Trustee.

A After you think about it. So as I said earlier, I think I'm looking for a distribution check from here.

Q Now you -- I mean, you can't sue yourself, can you, sir? If the member has violated this agreement and the member is supposed to sue, prosecute and defend suits, you can't sue and defend. That's the Trustee's job to sue. You understand that?

A Well, I can't comment on the effect of the Bankruptcy Act on this Operating Agreement because --

Q But you haven't spoke to the Trustee.

A -- I think it's executed in 2005. So at that point I would agree that this is a standard Operating Agreement that looks pretty much like every other --

Q Regardless ---

A -- Operating Agreement --
Q Regardless ---
A -- that has the same liquidation provision.
Q Do you understand that the Trustee is the representative of Master Lending Group, LLC and not you? The Trustee is the representative by law, Section 323 of the Bankruptcy Code.

MR. BANTER: Your Honor ---

Q Do you know this?

MR. BANTER: Your Honor, I think he is asking for legal conclusions. I am also unsure of how these questions relate to the ultimate motion at hand which is the motion to strike an amended schedule.

MR. GORDON: Well, I can respond if you're done.

MR. BANTER: I think it's a two-part objection.

MR. GORDON: First of all, it's not a legal conclusion that can't be asked to a lawyer; second, who maintains that he's a very experienced one in administering estates though, admittedly, he's not probably had one with the bankruptcy aspect of it. Two, Section 323 of the code is a -- is set out by Congress. It is a statute. I am not asking for anything other than the plain meaning of what's written there that the Trustee is the representative of the estate and with the Trustee is the only one with the capacity to sue and with the points that I've made going through all of this is every one of these points that I've had him read or that I've read would be

a direct conflict with the company. A direct conflict with the company. For him to pursue any of those things is a direct conflict with the company and, yet, he is going about signing amendments to schedules for the company and that shouldn't be happening. That's all.

THE COURT: And it's ---

MR. GORDON: I'm actually done.

THE COURT: And it's because he's wearing two hats; right? He's wearing the hat as the estate administrator and then he's trying to represent the debtor by filing pleadings on behalf of the debtor?

MR. GORDON: That he knows nothing about.

THE COURT: I mean, so, I didn't look at the amendment, but did counsel file the amendment that Mr. Ratcliffe signed?

MR. GORDON: Mr. Hill did, yeah.

THE COURT: All right. So, Mr. Hill, acting as counsel for the debtor, is the one that filed the paper; right?

MR. GORDON: It would appear so.

THE COURT: And he got Mr. Ratcliffe to sign it thinking he was the logical person to do it. I mean, I don't disagree that there might have been a conflict there, but I'm not sure who else on the planet could have stepped in and signed ---

MR. GORDON: There is no one. That is the point.

There is no one because the Trustee has taken over the estate and the schedules are the schedules, but ---

THE COURT: So the Trustee can't file schedules; right? Anyway, let me get back to Mr. Banter's objection. I sustain the objection. You're asking -- you're asking this witness to recite, essentially, statutory provisions or case law that they are what they are. So I'll sustain the objection.

Q And, finally, the disclaimer is very long. You remember you signed a very long disclaimer?

A Yes, I did.

Q It says here -- and I am just reading from it -- that you "relied upon administrator's own actions and investigations, the efforts, statements, advice, and representation of debtor's legal adviser." That's what you're telling us today; correct?

A (No audible response)

Q All right. And you hadn't yet -- you're fixing to do most of that, but you've already signed and had filed this amendment?

A Well, yes, sir.

MR. GORDON: All right. Your Honor, that's what we have. The point of this is as much as anything that it's our position he doesn't have the authority to be doing this and it's a direct conflict under the Operating Agreement of the company itself and we don't want to see it again because it's

creating a lot of havoc when somebody who knows nothing about the case signs this. I don't care if you have a disclaimer that's like this. These shouldn't be getting filed and a lot of people look at these schedules and it's not just professionals. There's investors and other people that look at it and it's very confusing.

I am not asking for any punitive action, you know. I mean, I know he's acting in good faith and doing what he thinks is best. It's a confusing situation to be in, but to do all this without ever even talking to the Trustee is crazy. I mean, that doesn't even make sense.

THE COURT: All right. Well, Mr. ---

THE WITNESS: Sir, I would correct that because I don't want it to quite end up where it is in the record at the moment. I understood there would be conversations going on between counsel for the company and the Trustee.

THE COURT: Okay. All right. So, Mr. Ratcliffe -- Mr. Ratcliffe?

THE WITNESS: Yes, sir?

THE COURT: Mr. Hill -- I granted -- I hope I didn't make a mistake -- granted -- the first thing I did at the hearing today was grant Mr. Hill's motion to withdraw as counsel. So now we got a debtor that doesn't have a lawyer.

THE WITNESS: Yes, sir.

THE COURT: So do you agree that it would be

inappropriate for you to do anything on behalf of this debtor again?

THE WITNESS: I would not think so because I think the Trustee, frankly, is control of the environment --

THE COURT: All right. So ---

THE WITNESS: -- and whatever happens or doesn't happen will happen before Your Honor and at the behest of the Trustee and her lawyer.

THE COURT: Okay. So now we've got a debtor with no lawyer and the executor or the administrator of the estate is representing he won't be making any filings. So -- and this happens. I mean, individual debtors die and that doesn't prevent the Trustee from administering an estate and doing everything even though they don't have a debtor to sort of help and give information that the Trustee has to go look for it.

MR. GORDON: I am not sure, Your Honor, but I thought that in the order on Mr. Hill's withdrawal wouldn't be final for 14 days. So I thought there still is a gap here where maybe this could be corrected, but I don't know if that's the practice locally or not.

THE COURT: Are you objecting to his withdrawal?

MR. GORDON: No, no, no.

THE COURT: Okay.

MR. GORDON: I am just saying that I think that he is still in for 14 days after the order is entered until it

becomes final unless Your Honor directs that it's instanter, of course.

THE COURT: All right.

MR. GORDON: I am not taking the position on that. Mr. Hill would probably like to be instanter, but I am not positive.

MR. HILL: I would like to be nunc pro tunc, Judge.

THE COURT: Understood. I'll mull that over. I hadn't thought about a 14-day rule.

MR. GORDON: But I don't have any more questions for Mr. Ratcliffe. I appreciate his time and patience.

You can just leave that up there for now.

THE COURT: All right. Any other counsel wish to examine Mr. Ratcliffe?

MR. BANTER: Your Honor, I do have a few questions for Mr. Ratcliffe if I could reserve some time for legal argument -- just a few questions for him, though.

THE COURT: All right. And you are counsel for the estate.

MR. BANTER: Yes, sir.

THE COURT: But you're not counsel to this -- so your communications are not privileged; is that your position?

MR. BANTER: No, Your Honor. We do represent the executor -- excuse me, the administrator of the estate which is

Tom Ratcliffe because we represent the estate.

THE COURT: All right. Well, proceed with caution then.

**CROSS EXAMINATION**

BY MR. BANTER:

Q Mr. Ratcliffe, do you -- are you aware of any amended schedules that were filed for this bankruptcy absent the one that you signed?

A Yes.

Q Do you know why those amended schedules were filed -- originally filed?

A I'm sure it was to make just that -- an amendment to the schedule.

Q And I think you testified earlier that you were aware those amended schedules -- again, not the one you filed, but those amended schedules were withdrawn?

A Yes.

Q Do you know why those amended schedules were withdrawn?

A As I understand it, it had something to do with the execution of the documents.

Q And it's been the focus of the schedule that you signed -- the fourth amended schedule -- that absent from that schedule were two -- two items -- an insurance policy and a bank account. Do you understand that?

A Yes.

Q Was it your understanding that those two items were previously -- previously on those amended schedules or not?
A My understanding is that they weren't on the amended schedule.
Q They were not on the previous amended schedule? And is it your understanding that your fourth amended schedule -- the one that you filed -- did not have those on there; correct?
A Did not.
Q Why did those -- why were those two items not on there?
A Because the account was clearly in Gregory Hirsch's name --
Q How do you know that?
A -- individually. I'd seen the bank statements.
Q The bank statements for the account that was not going to be a part of the bankruptcy estate had Gregory Hirsch's name on it?
A Absolutely.
Q What about ---
A And, similarly, the insurance policy I looked at that was being removed was -- I just confirmed behind you that they were -- it was owned by him and the beneficiary was not Master Lending Group. So I didn't see a problem with the amendment of the schedules. So I kind of double-clutched it behind you.
Q Is it your understanding that by filing the fourth amended schedule was to keep the status quo the ones that were being withdrawn at a time?

A Sure.

MR. BANTER: Your Honor, I have no further questions for Mr. Ratcliffe.

THE COURT: All right. Mr. Ratcliffe, in the probate case that Judge Bordeaux --

THE WITNESS: Yes, sir?

THE COURT: -- is in charge of --

THE WITNESS: Yes, sir.

THE COURT: -- do you have something like a claims bar date --

THE WITNESS: Yes, sir.

THE COURT: -- where creditors --

THE WITNESS: Yes, sir.

THE COURT: -- have a deadline to submit a claim?

THE WITNESS: I was appointed in the early part of September. I think on the 7th maybe. I had -- and the last -- the way that goes and I'm not being professorial, but you got to run the notice to debtors and creditors has to be advertised once a week for four weeks.

THE COURT: Has that been done?

THE WITNESS: Yes. It was done and the last advertisement was done on the 13th of October.

THE COURT: All right.

THE WITNESS: And the bar date for filing the claims in that court is three months from the last date that

publication occurred.

THE COURT: All right. So if any of the creditors in this case wanted to file claims in the probate case on the theory that maybe this debtor doesn't have any money because it went to Mr. Hirsch, they could theoretically file claims three months -- within three months from October 13?

THE WITNESS: Yes, sir.

THE COURT: All right. I am not saying they should.

THE WITNESS: I would think there's one more significant hurdle they have to come over, though.

THE COURT: What's that?

THE WITNESS: They have to get through Master Lending to make the estate liable. Unless I have a debt or an obligation that the estate is liable for -- that doesn't mean they can't file the claim. I am just saying that would mean that the claim would have to include piercing the corporate veil to each ---

THE COURT: But if the claim was against Mr. Hirsch on the theory of piercing the corporate veil, somebody could file the probate claim and then litigate the piercing later; right?

THE WITNESS: Yes, sir. Yeah, they would have to file the claim and they would have to then litigate.

THE COURT: Okay. But they're not time barred because they didn't -- I mean, it takes a long time to pierce the corporate veil.

THE WITNESS: Yes, sir.

THE COURT: I mean months and months, if not years and years, so.

THE WITNESS: Right.

THE COURT: If that's your theory, a creditor could file that claim and then litigate it in probate court; right?

THE WITNESS: Well, they wouldn't have the ability necessarily to litigate without an appeal. So in the real world there is likely to be some sort of -- you could try it in the probate court, but it's a de novo hearing appealed to the Superior Court.

THE COURT: Right.

THE WITNESS: And that's -- then you're two or three jumps further.

THE COURT: I mean, if it was overly simple it wouldn't be any fun, but Ms. Caron might be a creditor as Trustee; right?

THE WITNESS: Absolutely.

THE COURT: That would be a more direct route, wouldn't it?

THE WITNESS: Well, I understand. I acknowledge that I have allowed and we filed by the bar date a claim here because I couldn't determine whether we had made loans to Master Lending --

THE COURT: Right.

THE WITNESS: -- or whether we were making capital contributions.

THE COURT: Understood. Understood.

THE WITNESS: So we didn't waive the bar date. I understand the problem.

THE COURT: Right. Okay.

THE WITNESS: I, unfortunately, Your Honor, have not much more information than the Court has.

THE COURT: All right. Mr. Banter, anything else?

MR. BANTER: We have no further questions from Mr. Ratcliffe.

THE COURT: Anything else? Mr. Gordon?

MR. GORDON: On redirect.[sic]

**RECROSS EXAMINATION**

BY MR. GORDON:

Q You just testified about your investigation before -- that you made before you decided that you would sign that amendment related to that insurance policy. I want to show you another exhibit -- just the highlighted portion there. Would you just tell me up there -- you're going to need your glasses for sure.

MR. BANTER: What exhibit is this?

MS. HALL: What exhibit?

MR. GORDON: T-4. I am not having it read into the record.

THE COURT: T-4?

MR. GORDON: One paragraph of T-4.

MR. BANTER: Your Honor, I believe T-4 is one of the exhibits we object to. We can determine that very quickly, though.

MR. GORDON: Well, we'll put it into the record then if we need to, but the point is he said that he did an investigation. This was an email to Jud Hill and that the Trustee received from Jud Hill. So he had these records.

I want to know if that was an email that you read before you signed this amendment that you did. Go ahead and take your time and read that highlighted portion to yourself.

MR. BANTER: Your Honor, I am going to object to this document. There's been no foundation for it. It appears to be hearsay. To the extent these are emails, they appear to be between counsel and numerous individuals.

MR. GORDON: The only question is whether he read it. The only question is whether he read it as part of his investigation.

THE WITNESS: I did not read it.

Q Are you reading it now?

A Yeah.

Q Do you see whose initials are at the end of that email?

MR. BANTER: Your Honor, same objection.

MR. JONES: Your Honor, I object because the witness has just testified he's never read it. So there is no point in

asking him anything about the document. Mr. Gordon stated --

MR. GORDON: Oh, there is a point.

MR. JONES: -- he was not going to try to introduce the text of the document. So I don't understand the point of the question.

THE COURT: All right. What about that, Mr. Gordon?

MR. GORDON: The point of the question is he contradicts -- it contradicts the previous testimony of what his conclusions were.

If you had read that and if you had talked to Mrs. Hirsch, which you apparently didn't do, would you have signed that ---

THE COURT: Mr. Gordon. Mr. Gordon, let me rule on the objection.

MR. GORDON: Oh, I'm sorry, Your Honor. I am getting ahead of everything. Sorry. Late in the day.

THE COURT: It is late in the day and I'm trying -- I was trying to read something and not listen to the objection at the same time. You asked this witness if he had ever read that document and he said no.

MR. GORDON: I asked him to read it now.

THE COURT: Any objection to the witness reading a document?

MR. JONES: Your Honor, to himself, that is fine, but as far as reading it in the record --

THE COURT: Yes, sir.

MR. JONES: -- Mr. Gordon said that he only had one question for the witness and that was whether he had read it in making the decision. The witness has testified that he did not read it prior to making the decision. So I thought that ended the inquiry.

THE COURT: All right. That may be true.

Is your question -- are you asking him to read it to himself?

MR. GORDON: That's what I asked him to do.

THE COURT: Silently without moving his lips?

MR. GORDON: That's what I asked him to do.

THE COURT: You can read it to yourself.

THE WITNESS: Yes, sir.

THE COURT: Let me know when you're done.

And is this document one page or four pages?

MR. GORDON: It is several pages, but I only asked him to read one item in it that related to his testimony just before.

MR. BANTER: Mr. Gordon, can you identify what portion you've asked him to read, please?

MR. GORDON: Yes.

THE COURT: Is this on the page that begins, "Thanks, Jud"?

MR. GORDON: It begins at the top of the page. It's

-- it's an email from Jud Hill dated June 26 at 5:16 p.m.

THE COURT: All right. I don't have that.

MR. BANTER: Judge, it's the fourth page of T-4.

THE COURT: I got it. Okay. Thank you.

THE WITNESS: Yes, sir.

Q Have you finished reading it?

A Yes, sir. I read it.

Q Do you see the initials at the end of it? Don't say it out loud, but just do you see them?

A Yes.

Q Do you know whose initials those are? Don't say it out loud. Just yes or no.

A I have a suspicion.

Q Okay.

A Is that good? But I don't know that.

Q But having read that now and this came, again, from the records we got from the attorney you said was advising you, does that change your perspective on that policy?

A I don't know that I can correlate this policy with some other policy.

Q Okay. That's fair.

A If you see what I'm saying.

Q Yeah. Yeah. You can't specifically identify it as the policy in question?

A That ---

Q That's a fair response. That's a fair response. That was all I had.

MR. BANTER: No further questions, Your Honor.

MR. GORDON: Nothing further, Your Honor.

THE COURT: All right. Any other questions of this witness?

All right. Mr. -- yes?

MR. BANTER: I'm sorry. Just for legal argument.

THE COURT: Yes, please.

MR. BANTER: May he be released, Your Honor?

THE COURT: Yeah, you can have a seat.

THE WITNESS: Thank you, sir.

THE COURT: Thank you, Mr. Ratcliffe. Good to see you. You need to give those back to somebody?

MR. BANTER: Just a few legal remarks.

THE COURT: Yes, sir.

MR. BANTER: Your Honor, you started by saying you never seen a motion to strike an amended schedule and that's because it is an extraordinary remedy and this is a unique and most unusual bankruptcy case. We understand that, but, first, the reason it's unusual is because Rule 1009 allows that. That's one of the arguments we're going to make.

Second is that it's been admitted that what Mr. Ratcliffe did is that he allowed the status quo to continue on about two key -- the two key items we're talking about: The

policy and the bank statements for a Truist account to be left off to keep the status quo, but, also, further based on his own investigation.

Your Honor, I think it's important that we recognize the circumstances of what -- of when the amendments were withdrawn and, also, further when the fourth amendment was filed. As you heard today the testimony is the three amendments were withdrawn to fix the issues regarding the wet ink signature that we all know about and the fourth amendment, again, which was filed ---

THE COURT: Well, tell me the wet sink signature we all know about.

MR. BANTER: Sure, Your Honor. The issue that's come to light is that some of the earlier schedules weren't directly signed by the person who had the authority to sign at that time who was Mrs. Judy Hirsch through her power of attorney. To correct that procedural issue -- again, not a substantive issue, a procedural issue -- the Chapter 7 Trustee asked debtor's counsel to withdraw those three amended schedules. That's what was done.

At the time those schedules were withdrawn, however, Mr. Hirsch already passed away. The only person left standing on the face of the earth that could sign it was Mr. Ratcliffe in his capacity as administrator of the Gregory Hirsch estate. That's first why the amended schedules were done. It is

important to note that the last amended schedule that was done had already removed the 5 million insurance policy we're talking about and had already removed the bank account -- the 975,000 -- from that. So the status quo was that those were already not part of the bankruptcy estate here.

Again, to correct that issue those were withdrawn and to file a new correct amended schedule was the fourth amendment that Mr. Ratcliffe signed again as his capacity as administrator. The sole purpose of that was to ensure that this court had a correct and accurate amended schedule as was already the case based on the review of the counsel, Mr. Ratcliffe's own review. As he said he examined the insurance policy, looked at the bank statements and was to ensure that was accurate.

That's important to know because, first, number one -- our point number one is under Rule 1009 the debtor is allowed to make amendment at any time. To undo such an amendment the Trustee or any other party must show an act of bad faith. A bad faith is shown if there is done -- if the amended schedule was done to delay or was intentionally done for some type of economic interest to the prejudicial impact of any others. On the motion for the motion to strike there is no evidence or even allegation that the fourth amendment was done in bad faith.

Again, what you heard in testimony is that

Mr. Ratcliffe examined the documents himself. He relied on counsel and he relied on debtor's counsel to file the fourth amendment, again, to ensure that the previous schedules that were filed that were withdrawn that we had a perfected schedule on file. So, again, under Rule 1009(a) the amended schedules can be filed at any time and absent a filing of bad faith that amended schedule should persevere.

Ultimately, Your Honor, as you noted earlier the amended schedules are the amended schedules. We want accurate and complete amended schedules to the extent we know, but they don't govern complete -- the case completely about what is and is not an asset of the estate. We're filing these on good faith and the information we have as we understand there is a lot of moving pieces here, but it is not the one document to control the rest of the case about whether an asset is an asset or not.

For instance, a debtor cannot say that they own any house -- the White House. They can't list the White House on an amended schedule and that govern the case. Of course, you list it to the best information you can. You do it in good faith and you prove that later on. That's what was done here. Rule 1009 allows that. It should be freely given unless there is bad faith. There is no bad faith here.

Second, the Trustee has admitted that on the face of the policy -- the 5 million-dollar Prudential policy and the

bank account statements -- that they are not listed in Master Lending. We heard testimony from Mr. Hays earlier asking on the Excel sheet do you list -- do you see any of those policies being owned by Master Lending? The answer was no. I asked him if he had seen where Master Lending was the beneficiary of any of those policies. He said no.

You heard testimony from Mr. Ratcliffe. He examined that policy itself -- the four corners of that policy. Master Lending was not listed. So him relying on his own efforts and advice of counsel and debtor's counsel, he in good faith filed an amendment to accurately represent that those were not assets of the estate which, again, you've heard from their own expert that he himself had not seen beyond on the four corners that was an asset of the estate. The Trustee has admitted that those are not assets of the estate. That's simply what Mr. Ratcliffe did.

And, third, Your Honor, it is inconsistent what the Trustee has taken about who has the authority to sign. Of course, Greg Hirsch died on August 3. There was no one that could sign until Mr. Ratcliffe was appointed as administrator, but if Mr. Ratcliffe couldn't sign the amended schedules, who could at this point? And what the Chapter 7 asked is to correct the issues of the wet ink signatures that I've discussed. They wanted debtor's counsel and Mr. Ratcliffe to sign and withdraw those amended schedules, but then when

Mr. Ratcliffe turned around and signed the appropriate schedule as he deemed fit with his counsel and in good faith, that's not acceptable.

You can't have it both ways. You can't have debtor's counsel do -- the last member who had authority to sign to withdraw a schedule but then at the same time files an amended schedule to keep the status quo -- you can't have it that they can sign it; then they can't sign it. You know, Mr. Ratcliffe did what was in his good faith and he did what he had the authority to sign.

And, lastly, Your Honor, Georgia law is clear that when you have a sole membership LLC which we have here -- Master Lending Group -- that the sole member -- when the sole member dies the administrator steps in the shoes of that sole member. They have the authority to sign on behalf of that sole member and have the duties of that sole member.

THE COURT: Is that a statutory provision?

MR. BANTER: Yes, Your Honor. OCGA 14-11-506: "If the last member of a limited liability company dies, the member's executor or administrator shall become a member of the LLC." There is an "unless" and the unless is if the administrator elects not to become a member of the LLC. There's been no evidence that I can report to the Court that Mr. Ratcliffe has not done that. Again, Mr. Ratcliffe was the last man on the planet that could appear to have the authority to sign Gregory

Hirsch as his administrator and that's what he did.

So, in conclusion, Your Honor, what we have here is we've had to correct some mistakes. There was a fourth amendment filed and that amendment was filed to keep the status quo the way it was, but to, more importantly, to offer based on all the information we have a complete and accurate amended schedule for this court. Pursuant to Rule 1009 the debtor had the authority to do it. Mr. Ratcliffe had the authority to do it and there's been no evidence or showing of bad faith to say what Mr. Ratcliffe did was in bad faith.

Two, the Trustee has admitted that you've heard evidence today and testimony today that what was noticeably left off, again, which had already previously been left off, that those were not assets of the estate in looking at the four corners of those documents, and, third, under Georgia law and under the authority Mr. Ratcliffe had he was the last person that could sign it and he did so to report back to the court.

THE COURT: All right. Thank you very much.

Mr. Gordon?

MR. GORDON: Yes. The problem with those arguments is that his statement of law is wrong right from the beginning in terms of Rule 1009. Rule 1009 -- all of us who deal regularly in bankruptcy -- particularly, consumer bankruptcy -- know that there is this right to amend at any time and it happens frequently. We all are aware of that and it says here in

109 [sic] that the debtor can amend as a matter of course at any time before the case is closed.

THE COURT: 1009?

MR. GORDON: 1009. However, what counsel conveniently skips over it then says, "On motion of a party in interest" which is what we have here today "after notice and a hearing" which we had "the court may order any voluntary petition, list, schedule or statement to be amended and the clerk shall give notice to the amendment to entities designated by the court."

The question came up -- and it's misleading to say he's the only person who can do it. That's not true. Trustees do it. I can tell you Mr. Hays was Trustee in a case I represented him in in an Atlanta corporate case. It was an involuntary filing which this, essentially, became like an involuntary filing after Mr. Hirsch died because he was the last person who knew anything really about what was going on, apparently, because, as I understand counsel for Judy Hirsch, they don't believe that she knew much about it, and -- if anything. So if Greg Hirsch dies, then what happens?

Well, that happened in a case where Mr. Hays was Trustee called Trade Am, a very significant case. There was nobody to prepare the schedules and he was ordered to prepare the schedules and he agreed to do it by Judge Mary Grace Diehl. It wasn't easy, but he did it because he knew more about the company than anybody left.

This gentleman who I appreciate him and I appreciate his many years of service doesn't know anything about the companies, admitted he knows nothing about it. He never spoke to the Trustee. He didn't speak to me. He didn't to Mr. Hays. So he is just doing what he's being told by an attorney who is now withdrawn or about to be. Fine. But the fact of the matter is there is somebody who knows about the case and that's the Trustee and the Trustee has been working on the case for a long time.

This is no different than an involuntary where we had to file a motion like this and we and Mr. Hays end up being appointed by the court to do it even though he was a Trustee. Yes, you want the debtor to do it because the debtor -- it's the debtor's job. It is the debtor's responsibility, but when it is a company and there is nobody left that's the debtor, then it is a quandary. It is not good to have somebody who knows nothing about the case signing schedules and filing them with the court despite the disclaimer. They shouldn't be filed at all.

You have a Trustee who could have handled this, could have done it, but there was no discussion with her at all. It's 1009(a), the same rule that he is citing is the one that gives that authority. It's the authority that we obtained in the Trade Am case when Mr. Hays had the very difficult task of preparing the initial schedules even -- not just an amendment,

but the initial schedules -- but it was done and I acknowledge that it is rarity, but this is a very rare situation.

We shouldn't be having somebody who knows nothing about the case filing anything. Under this situation the default mechanism is the Trustee is the best person to be doing it and it's as much preemptive as anything else because we don't want to be seeing this going on. People shouldn't be doing this under penalty of perjury, disclaimer or not.

THE COURT: All right. So, Mr. Gordon, if -- would you have me in an order give Ms. Caron authority to amend the schedule?

MR. GORDON: Absolutely.

THE COURT: All right. Would you advise Ms. Caron to add the insurance policy back?

MR. GORDON: I would.

THE COURT: On what basis?

MR. GORDON: No, not exactly. Not exactly. I would just have her withdraw this amendment and then the original schedules which she didn't sign -- were signed by the power of attorney for Greg Hirsch -- would go back in.

THE COURT: And the last of those that was done while Mr. Hirsch was still alive -- in other words, when her power of attorney was still valid -- would that have listed the insurance policy as an asset of the estate?

MR. GORDON: Yes. The last one while he was alive

still had it in there. It was the day after he died that there was one that finally came in that removed it, but then the power of attorney was no longer in effect because it dissolves upon his death. So he had died a day earlier. So that amendment would have been a nullity anyhow.

THE COURT: All right. So just kind of following this to its logical conclusion, Ms. Caron amends, declares that the estate owns the policy, and then I guess we would have to litigate that. I can't imagine that Mr. Jones would just, you know, tell Prudential to send you a check. So when we litigate it ---

MR. GORDON: It is being litigated, yes.

THE COURT: Yeah, so when we litigate it, it is going to be -- one issue is going to be who owns the policy; right?

MR. GORDON: It's more of who has -- well, I don't want to get too much into this. Leon is right there, too, but ---

THE COURT: I withdraw the question. I withdraw the question.

All right. I'm going to take this issue under advisement, but I am going to ask that counsel for both parties submit proposed orders supporting your position. So you submit me a proposed order granting the motion to strike and, Mr. Banter, you do the same in your favor.

Now, Mr. Banter, do we have an understanding -- a

gentleman's agreement -- that Mr. Ratcliffe won't file any future amendments? Or if you find the need arises, if you think he needs to do so, can we request by motion permission to do so?

MR. BANTER: Absolutely, Your Honor.

THE COURT: All right. Now that's just our understanding, but I may rule in favor of Mr. Gordon and declare in an order that he no longer has the authority to so act. I am -- in other words, I am taking it under advisement. I don't know really know how it is going to play out, but I continue to believe that, you know, the propriety of the amendment is one thing, but it doesn't change, you know, who owns the assets, and just because Mrs. Hirsch is the beneficiary and maybe MLG doesn't own the policy, it doesn't mean that the Trustee won't prove that the money that was used to pay the premiums on that policy came through, essentially, theft from these investors because we probably wouldn't want the absurd result of Mrs. Hirsch having millions of dollars that was acquired through MLG paying premiums and these investors having nothing. That might be an absurd result.

So we want to be careful about, you know, relying too quickly on, you know, the title to something before we figure out how she got it and that goes for beach houses and whatever else might have ended up in her possession.

All right. So I'll take under advisement your motion

to strike. Now, I want to address the motion for turnover of property. This is at Docket 140 filed by Ms. Caron. Mr. Hill filed a response. Tell me about that motion.

MR. GORDON: Yes, Your Honor. Neil Gordon, for the record, on behalf of the bankruptcy estate and the Chapter 7 Trustee. Your Honor, I know everybody has read this motion and Mr. Hill responded to it. The motion was filed on October 2 seeking turnover of the remaining documents that the Trustee had not received from Mr. Hill and Gastin & Hill Law Firm which are property of the bankruptcy estate and which the Trustee had demanded after waiving attorney-client privilege pursuant to the U.S. Supreme Court case of 1985, Commodity Futures Trading Commission versus Weintraub.

This is a Supreme Court case that should be very familiar to corporate bankruptcy attorneys because I can tell you in many, many, many cases as Trustee in corporate cases I waived the attorney-client privilege and obtained all of counsel's records with memos, notes, everything with the debtor entity, and so attorneys are often very, very careful when they're representing a corporation. Probably nobody in this room represents more businesses than Leon Jones sitting back there. He represents quite a few of them in the Northern District of Georgia, but it is -- with Trustees that know what they're doing, it's a common request.

I can read into the record paragraphs 11 and 13 of the

motion which detail what we are seeking, but, primarily, we're seeking everything that hasn't been turned over including notes, handwritten or electronic, memos or other writings reflective of each conversation debtor's counsel has had with anyone and the directives concerning the amendments, the contents of the schedule, as well as any assets or liabilities. It is a --

THE COURT: Mr. Gordon --

MR. GORDON: -- long list.

THE COURT: Mr. Gordon, let me interrupt you. You may assume I read the motion and I understand the broad scope of things you would seek. Let's focus on the waiver of the attorney-client privilege. First of all, we might need like a matrix or something. I need to know who the lawyers are potentially and who they represented. In other words, is it just Mr. Hill -- Judson N. Hill --

MR. GORDON: And his firm.

THE COURT: -- who represented the debtor?

MR. GORDON: Yes.

THE COURT: And you believe Ms. Caron effectively waived that pre-petition privilege and any post-petition privilege; right?

MR. GORDON: We sent not just by letter but I made it very clear at the 341 meeting on the record there as well and we did get some records. We did get boxes of records, but

there are other records and we don't know the extent of them.

THE COURT: All right.

MR. GORDON: But we did not get them. That's the only firm it's directed to is that firm.

THE COURT: All right. So, Mr. Hill, are you represented by counsel in this issue?

MR. HILL: No.

THE COURT: All right. You're representing yourself; right?

MR. HILL: Yes, sir.

THE COURT: All right. So do you dispute that Ms. Caron has effectively and properly waived the attorney-client privilege between the debtor, Master Lending Group, LLC, and you and your firm?

MR. HILL: Yes.

THE COURT: She has properly done that?

MR. HILL: Between -- communications between Master Lending and my firm, yes.

THE COURT: Okay. Now and you've turned over certain things to the Trustee; right?

MR. HILL: Yes, sir.

THE COURT: And I thought I understood from the papers that you were a little unsure about some communications because they might have been between -- involved another law firm.

MR. HILL: There are exchanges of communication

between myself and Mrs. Hirsch in which she has asserted personal attorney-client privilege.

THE COURT: All right. So ---

MR. HILL: And then -- and that's -- as I try to make clear in my response, out of an abundance of caution I wanted to request a hearing so that anything that I do turn over is the result of an order from this court whose reviewed whatever it is that Mrs. Hirsch's attorneys or any of other law firm's attorneys or Mr. Hirsch's state's attorneys want to raise about communications that I had with them.

THE COURT: All right. So what I'd like to do is take some testimony from Mr. Hill. I've testified a few times as a lawyer. It was like the most uncomfortable thing a lawyer can ever do and I apologize for putting you through that, but I want to ask Mr. Gordon to inquire about the attorney-client relationship; that is, who you think you represented, number one, and how you document when you represent somebody and when that documentation happened in this case. Okay?

MR. HILL: Yes, sir.

MR. GORDON: And Your Honor is probably aware, but Mr. Hill attached as Exhibit A to his response a letter, I believe, from Mr. Jones -- yeah, from Mr. Jones. It is just a little over a page. It's not long -- where it's asserted that Mrs. Hirsch believed that it affects the attorney-client relationship that I believe Mr. Hill is going to say is not so

and their position is -- I don't know where she is, but I guess she's in the courtroom to testify but, please ---

THE COURT: All right. Mr. Hill.

MR. GORDON: I just wanted to be sure the Court had the letter.

(Judson C. Hill is duly sworn.)

THE COURT: All right. Go ahead, Mr. Gordon.

MR. GORDON: I'll let Mr. Hill get situated.

**DIRECT EXAMINATION**

BY MR. GORDON:

Q Mr. Hill, you are until maybe today or shortly after today counsel of record for Master Lending Group, LLC -- correct? -- in this bankruptcy?

A Yes, I am.

Q And did you or your firm, Gastin & Hill, sign an engagement agreement with Judith Hirsch in her capacity as power of attorney for Master Lending Group?

A Yes.

Q And did you ever sign an engagement agreement with her on an individual basis for her?

A No.

Q Did you or Gastin & Hill receive a retainer check on your representation of -- can I just call it MLG?

A Yes, please.

Q For MLG that came from an account -- bank account of MLG?

A We did.
Q And that was the $40,000 check?
A Correct.
Q And did you ever receive a retainer from Mrs. Hirsch or anybody else for this MLG case?
A I want to clarify that. Initially, the check that -- the first check that we received was written on Greg Hirsch's checking account.
Q A Greg Hirsch checking account?
A The first $40,000 check that we received.
Q And he was still alive?
A He was still alive.
Q Okay.
A Within a matter of days I was able to confirm that there were funds in the Master Lending Group checking account. At that point I had no more records -- no updated records at all about the balance of what might have been in that corporate checking account. Mrs. Hirsch did not have access to that. Once we confirmed that there was sufficient funds in that account, we issued a refund check to Mrs. Hirsch and then she wrote a check payable on the Master Lending Group account.
Q Under her authority.
A Right. That's the ultimate check. So, initially, we received a check payable from Greg Hirsch's personal checking account. I wrote back to her once we confirmed and I said,

"Listen, to avoid the appearance of a conflict, I want to give you a refund check on this $40,000 and take a new check that's written on the Master Lending Group."
Q Okay, sir. And did you ever receive a retainer from Mrs. Hirsch for legal services to be provided to her individually?
A No.
Q And did you ever -- you or your law firm ever issue an invoice to Mrs. Hirsch for legal services for her personally?
A No. We -- the $40,000 was intended -- was contemplated to cover everything in this case. There were no invoices or any updated billing issued to her in her capacity as Mr. Hirsch's representative or and, certainly, not to her individually.
Q Not to her individually?
A No.
Q And did you -- did you or your firm provide any personal legal advice to Judy Hirsch -- not in her capacity as power of attorney, but in her individual capacity?
A I did not do -- if I did so, I did not do it intentionally.
Q To your knowledge at all times pertinent to the period of time we're discussing has Mrs. Hirsch personally been represented by Tim Roberts or someone else?
A Yes.
Q And would you provide personal advice to her through Mr. Roberts or any other attorney?

A I believe the answer would be the same. If the lines got blurred, it was probably due to a lack of caution on my part, but I certainly did not intend to advise Mrs. Hirsch personally at any point whether that was directly in the conversations I had with her or in the conversations that I had with her counsel.

Q The letter attached to your response -- the letter that is dated October 3 from Mr. Jones says -- and I'm just reading from it -- "Mrs. Hirsch delivered such documents". The Trustee, of course, had demanded documents and then it says, "Mrs. Hirsch delivered such documents to you based upon her understanding that you were acting as her attorney and adviser. Therefore, she delivered documents to you which are her documents with the understanding that such documents are covered by the attorney-client relationship and privilege," and then you were cautioned not to produce the documents lest you violate the attorney-client privilege.

Do you agree with that representation in the letter that you were acting as her attorney and adviser?

A No.

Q And are you prepared if the Court finds that you were not her attorney and that there is no attorney-client privilege to produce such documents as are called for under the demand?

A Of course.

MR. GORDON: I really think that's all I have for

Mr. Hill, Your Honor.

THE COURT: All right. Mr. Hill, if -- well, I noticed in your now withdrawn-without-prejudice fee application that your very first time entry on June 5, 2023, which is roughly a month pre-petition, your very first time entry is "Attorney conference". It says "Attorney J.C. Hill. JCH." That's you?

THE WITNESS: Yes, sir.

THE COURT: "Category, Attorney conference," and it says, "Review with T. Roberts."

THE WITNESS: Correct.

THE COURT: That's Tim Roberts?

THE WITNESS: Yes.

THE COURT: What firm is he with?

THE WITNESS: Oliver Maner.

THE COURT: So did you meet Mr. Roberts before you even met Mrs. Hirsch?

THE WITNESS: Yes.

THE COURT: And did he initiate that contact?

THE WITNESS: Yes.

THE COURT: And is it because somebody needed a bankruptcy lawyer?

THE WITNESS: Yes.

THE COURT: All right. And then I see four days later you have another conference with Mr. Roberts, .75 hours, and

then June 14, .25 hours, and it looks like your first conference with Mrs. Hirsch and then you did legal research and your first conference with Mrs. Hirsch was on June 15, 2023.

THE WITNESS: Yes.

THE COURT: All right. Who is Mr. Segal?

THE WITNESS: A creditor.

THE COURT: All right. So that time entry references a creditor conference, "Email with Segal"; right? Skipping down on June 16 only one day after your first conference with Mrs. Hirsch and at that time was -- had Mrs. Hirsch had -- was she operating under a power of attorney?

THE WITNESS: Yes.

THE COURT: She had that for a number of months; right?

THE WITNESS: Yes, sir.

THE COURT: Maybe six months or more?

THE WITNESS: I believe more than that. Yes, sir.

THE COURT: So, anyway, the very next day on June 16 you did some legal research on Ponzi issues. That's what your time records show.

THE WITNESS: Yes.

THE COURT: So who -- who's the first person that suggested to you that Ponzi issues might be at play here?

THE WITNESS: I don't recall. Honestly, I don't recall. Perhaps Mr. Roberts, but I don't recall honestly.

THE COURT: All right.

THE WITNESS: If I can give some context if the Court will allow.

THE COURT: Yes, sir.

THE WITNESS: The entire scenario by which this case came about was very unusual for obvious reasons. You got a single member LLC closely controlled to the point where Mrs. Hirsch per earlier testimony I feel comfortable speaking for is that she knew very little, if anything, about the operation of this business. Mr. Hirsch's health had deteriorated to a point where he was largely uncommunicative and, you know, certainly, not able to go into the office or function in any meaningful way, and, frankly, was in the final days of his life.

Mr. Roberts approached me because Mrs. Hirsch had retained him and presented him with all of these business records or a lot of the business records. We, ultimately, got some more from Hirsch & Tucker, but -- and said this LLC needs to go bankrupt, I believe, but I want you to look at it with Mrs. Hirsch. Mr. Roberts had already looked through a good bit of the records. We communicated and worked together closely as far as the very earliest stages before I actually met with Mrs. Hirsch just so I could get a handle on what the scenario was.

I didn't have a principal to talk to. I didn't have a

CEO or an accountant or anyone else and so I relied upon Mr. Roberts to, ultimately, provide me with the records that it takes to, essentially, recreate this business from ground up. I mean, you've heard Mr. Hays testify and, obviously, he's had an opportunity to delve into a lot of records that I didn't have, but everything I did have, you know, flowed initially from Tim Roberts delivering documents that he had in his possession before he ever reached out to me, and, you know, that is -- that's how the case, ultimately, got off the ground.

THE COURT: All right. Go ahead, Mr. Gordon.

MR. GORDON: No, I don't have any more questions at this time, Your Honor.

THE COURT: All right.

Anybody else have a question for Mr. Hill?

Mr. Jones?

Anybody?

**CROSS EXAMINATION**

BY MR. BANTER:

Q How are you doing, Mr. Hill?

A How are you doing?

Q Mr. Hill, I believe you testified earlier that there was just one engagement letter per debtor; is that correct?

A Yes.

Q And there is just one engagement letter for this Master Lending Group related bankruptcy filing?

A Yes.
Q Did that engagement letter specifically exclude the personal representation of Gregory Hirsch?
A No, sir.
Q Did that engagement letter specifically include the personal representation of Judith Hirsch?
A (inaudible).

THE COURT: Wait a minute. You said exclude Mr. Hirsch And then you said include Mrs. Hirsch?

MR. BANTER: Did it include that it would exclude Judy Hirsch.

MR. GORDON: I'm not sure I follow.

MR. BANTER: Yeah, I'm sorry, Your Honor. It's been a long day.

THE COURT: Why don't we start over because I think you used exclude and then you threw in include.

MR. BANTER: Sure.

THE COURT: I know you weren't trying to be tricky, but it kind of sounded like that.

MR. BANTER: No, definitely not, Your Honor.

Mr. Hill, let me know if you don't understand my question.

THE WITNESS: No, I understood where you were heading.

Q Did the engagement letter specifically exclude that you were representing Gregory Hirsch?

A No. There were no exclusions in the engagement letter or I mean in the fee agreement. There was nothing in there that made reference to excluding or including Mr. and Mrs. Hirsch. It's strictly addressed ---

MR. BANTER: That's my point, Your Honor.

THE WITNESS: It strictly addressed being retained and being the attorney for Master Lending Group.

THE COURT: Well, do you have a fee agreement and a representation letter? Are they separate?

THE WITNESS: Well, maybe I am confusing terminology. I don't have a representation letter. I have a fee agreement --

THE COURT: Okay.

THE WITNESS: -- contract. I don't -- in my mind that's the same thing, but maybe it's not.

THE COURT: Do you have a copy with you --

THE WITNESS: Yes.

THE COURT: -- because that's not something that our court requires be filed on the docket; right?

MR. PASCHKE: We don't necessarily require that, but we often ask for it, Your Honor. The -- I just wanted to advise the Court that I think the witness is referencing to Exhibit T-9 on the Trustee's exhibit list.

THE COURT: Oh, you're saying I already have it?

MR. PASCHKE: I think you might already have it, Your

Honor. T-9, Master Lending Group Retainer Agreement dated June 23.

THE COURT: All right. I apologize.

MR. GORDON: That's correct, Your Honor. It is on our list, the Trustee's list on number 9 -- T9.

THE COURT: All right. And that document which appears at Docket Number 172-1 indicates the client is Master Lending Group, LLC and the law firm of Judson C. Hill DBA Gastin & Hill Attorneys will represent client under Chapter 7 petition -- bankruptcy, rather.

One other thing. I notice that when you filed at Docket 1, page 43, your form 2030, the Rule 2016, you indicate that the source of the compensation paid to me was other that is not Master Lending Group, Gregory Hirsch, and then you went back and got the MLG check; right?

THE WITNESS: Well, that's not the exact sequence. That was typed after we got the first check from Mr. Hirsch.

THE COURT: Right.

THE WITNESS: Okay. It should have been corrected --

THE COURT: Okay.

THE WITNESS: -- because, I mean, we got the second check from MLG before we filed the petition.

THE COURT: Gotcha. All right.

THE WITNESS: I should have corrected that --

THE COURT: Understood.

THE WITNESS: -- when the petition was filed.

THE COURT: All right. Thank you.

Go ahead.

Q Mr. Hill, I believe you testified earlier that you did not intentionally provide legal advice or counsel to Mrs. Hirsch or Mrs. Hirsch on behalf of Mr. Hirsch; is that correct?

A That's correct.

Q Is it possible that you could have provided legal counsel advice to Mrs. Hirsch?

A Yes.

Q Is it possible that you could provided legal counsel to Mrs. Hirsch on behalf of her husband Mr. Hirsch?

A Yes.

Q Is it possible that the lines got blurred about what legal advice and counsel you're providing and to whom it was for?

A Yes.

Q No further questions, Mr. Hill.

THE COURT: You know Mr. Roberts?

THE WITNESS: Yes, sir, very well.

THE COURT: He is a good lawyer, right?

THE WITNESS: He is a tremendous attorney.

THE COURT: Right and he represented Mrs. Hirsch; right?

THE WITNESS: Yes.

THE COURT: He didn't need your help representing her,

did he?

THE WITNESS: No.

THE COURT: And, in fact, the real potential existed for conflicts between the interests of Judith and the debtor Master Lending Group; right?

THE WITNESS: Yes.

THE COURT: I mean, maybe this is hindsight, but you couldn't properly represent both of those people; right?

THE WITNESS: Oh, yes, no. That's absolutely correct.

THE COURT: All right.

MR. GORDON: Just briefly.

MR. JONES: I think it is my turn.

THE COURT: It is Mr. Jones' turn.

MR. JONES: You can redirect. I would ask Mr. Gordon be allowed to redirect -- recross -- after I ask some questions.

**CROSS EXAMINATION**

BY MR. JONES:

Q Mr. Hill, we never met before, have we?

A Maybe in passing at a seminar.

Q Correct. I think maybe at the coastal. You've never had a cross word with Judy Hirsch, have you?

A No.

Q Did you and do you still consider that you have a good working relationship with her?

A I do. I do. I have a tremendous amount of respect for the courage that she's shown trying to deal with this problem and I'm sorry that I'm here today and that she has had to retain you to represent her interest, but it is what it is.
Q And I think that you commented when you were being asked the questions by Mr. Gordon something to the effect that if the lines got blurred it was not your intent; is that correct?
A It was never my intention.
Q But you do recognize that it would be fair for Mrs. Hirsch to understand that you were giving her legal advice on her part?
A I think that's fair to say.
Q So as you said about the lines being blurred, despite your intent the lines did get a little blurry in this case?
A That seems fair to say.
Q In fact, you never told Mrs. Hirsch that you would not represent Greg Hirsch, did you?
A At some point in my interaction with Mrs. Hirsch at the outset of the case we had conversation and I -- the only specific, like, recollection I have, Mr. Jones, is that I told her that anything that implicated her personal interest she had good counsel. Now I am not willing to testify as to making any other disclaimers. I don't recall specifically what else I said to her. Frankly, that wasn't my focus at the outset of the case.

Q There was a lot going on, wasn't there?
A There was a lot going on.
Q And you do understand that Mrs. Hirsch has nothing but affection for you, don't you?
A I hope so.
Q Okay. But you never told Mrs. Hirsch that you did not represent her specifically, did you?
A I think my answer is the same. I don't recall using those specific words, but, again, I also don't want to fall too hard on my sword. I do know that as part of our conversation I cautioned her anything that might implicate her -- you know, her interest or Mr. Hirsch's interest, you know, she needed to be sure that she had counsel, but does that mean that, you know, ultimately, the lines didn't get blurred? I am not going to testify that that's what that means.
Q I guess we all know that you have confirmed to the Office of the United States Trustee and the Chapter 7 Trustee that Judy Hirsch did not sign any of the amendments in this case?
A That's correct.
Q And you may have discussed them with someone, but you never discussed those amendments with Mrs. Hirsch personally with her before filing them, did you?
A Correct.
Q In fact, she never saw them until maybe after they were filed and probably much later after they were filed, if ever?

A I don't know the answer to that.
Q Okay.
A I didn't show them to her.
Q Okay.

THE COURT: Mr. Hill, are you able to recall any specific legal advice you gave Mrs. Hirsch?

THE WITNESS: There are -- there is an email that has been turned over which makes reference to our initial conversation and part of what I told Mrs. Hirsch during that -- during that conversation was that the insurance policies would be an issue if they were, ultimately, traced back to Master Lending Group and she reassured me -- I believe it was the very first exchange of emails that we had she subsequently reassured -- and this is before the case was filed -- that that is not going to be the case, and I said, "Well, that's good." I probably should not have been having that conversation with her.

Aside from that, I don't recall anything that would constitute legal advice, but I think Mr. Jones' position as I understand it in his letter goes more to communications that she was making to me that, frankly, weren't about the bankruptcy case. They were about Mr. Hirsch's assets. I didn't never respond. I never responded with advice about those. I generally just forwarded them to Mr. Roberts, but it is readily apparent in hindsight that she shouldn't have been

sending me those emails, and if that's my fault, then it's my fault. If I didn't do a good enough job to caution her at the outset, then, you know, I am going to accept responsibility for that.

THE COURT: You answered my question. Thank you, Mr. Hill.

Any other questions, Mr. Jones?

MR. JONES: I think I have one, Your Honor, but I lost it. Your Honor, I'll say that we don't want to introduce emails because that might waive the privilege to the extent it exists. So we're trying not to introduce all those. The -- thank you.

THE COURT: All right. Mr. Gordon, any other questions?

MR. GORDON: Briefly. When I was up here before, Your Honor, I think we should have had Mr. Hill identify and -- for admission T-9 and T-11.

**REDIRECT EXAMINATION**

BY MR. GORDON:

Q T-9 is the bankruptcy employment contract. T-11 is the check from Master Lending Group, if you would, sir.

A That's what they are.

Q So those are the correct copies of those documents?

A Yes, sir.

Q Thank you.

THE COURT: Are you tendering T-9 and T-11?

MR. GORDON: Yes, Your Honor.

THE COURT: Any objection? Admitted without objection.

(Trustee's Exhibit Nos. 9 & 11 are entered into evidence.)

MR. JONES: Your Honor --

THE COURT: Yes?

MR. JONES: I'm sorry. I thought Mr. Gordon was finished. If he is going to continue, I'll wait.

MR. GORDON: (inaudible) sit down.

MR. JONES: I thought maybe you were finished with questions. So I just wanted to introduce a couple of exhibits, too, because I am glad you did that.

MR. GORDON: Oh, for Mr. Hill? Yes, I am done. I just wanted to authenticate those documents and get them admitted.

**RECROSS EXAMINATION**

BY MR. JONES:

Q Mr. Hill, Mr. Gordon properly admitted those. I just wanted to present you a couple of more. Do you have T-1 in front of you?

A I don't.

MR. JONES: Is there a Trustee notebook that the witness has been using?

MR. GORDON: What are we looking for?

MR. JONES: It is Trustee Exhibit 1.

If I may approach, Your Honor.

Do you recall receiving this letter from the Chapter 7 Trustee in this case?

THE WITNESS: I did.

Q And was this the first request you received from the Trustee for -- with respect to the Trustee's assertion of an attorney-client privilege written demand to your knowledge?

A Yes.

Q Okay. And then if you would I want to show you ---

THE COURT: You mean in this case or ever?

MR. JONES: In this case.

THE COURT: Oh, okay.

MR. JONES: Sorry, Your Honor.

THE WITNESS: Well, and ever as well.

Q And then I am going to show you with reference to the court and the other parties I want to ask -- I am going to show you page 43 of 50 in Docket No. 1 in this case which is the petition and the schedules and ask you if that appears to be a first attorney disclosure statement that you filed in the case under, I guess, 2017?

A Yes, it is.

Q And, in fact, when you filed the petition and schedules it showed that the $40,000 that you received to file the case had been paid by Greg Hirsch; isn't that correct?

A Yes, sir.
Q And then you later subsequently amended -- I think you did file an amended schedule which showed that the money had been paid by Master Lending; is that correct?
A Yes.
Q So, actually, you got the 40,000 from Greg Hirsch and then refunded it and then got another payment from Master Lending; is that correct?
A Yes.
Q And I think you've already testified to all of that. I just wanted to make sure we got that on the record.
A Yes.
Q And then the decision that with respect to listing the policy in the schedules when the petition was signed was made because you thought that the estate needed assets; is that correct? Or otherwise the case might be dismissed?
A That is part of the reason that when Mrs. Hirsch raised the possibility and we had the discussions concerning this policy I encouraged her to list it as an asset in the Master Lending Group bankruptcy.
Q And then you prepared the schedules which showed the equitable interest with her as the beneficiary; is that correct?
A Yes, sir.
Q Unvested equitable interest?

A Yes.

Q Okay. But that was in part based on your concern that there needed to be something on the schedules; is that correct?

A Well, I mean, that may be an oversimplification of it, but, yes. I mean, obviously, you know, I didn't see the point and I had the conversation with her -- I didn't understand what the point of filing a bankruptcy would be with 50-some-odd million dollars in claims without there being anything at all on Schedule B.

Now I realized at the time that there may or may not be, you know, clawbacks and this theory of net winners and net losers, and, obviously, if those pan out, you know, that's going to generate some real money, but, you know, again, my thought was as you said, Leon, I mean, I felt like that was the right thing to do, but, you know, I don't want to get too far beyond the scope of your question. Within just a matter of days ---

Q If I would ask -- you've answered my question. Thank you.

MR. GORDON: Your Honor, I am now going to have to ask some more questions because Mr. Jones really opened this up with those questions he just asked.

**REDIRECT EXAMINATION**

BY MR. GORDON:

Q I am going to ask Mr. Hill to look at Exhibit T-4, the same

paragraph we were talking about earlier in a document provided by him to the Trustee. Do you see that shaded part up there discussing the life insurance policy?

A Uh-huh.

Q And who was that email from?

THE COURT: Which exhibit is this?

MR. GORDON: T-4. The last page -- I believe it is the last page of T-4.

Would you confirm that, Mr. Hill, that that is the last page of T-4?

THE WITNESS: Second to last page.

MR. GORDON: Second to last page.

I am just waiting for the Judge to find it.

THE COURT: I've got it.

Q All right. Now that shaded area -- who is that email from?

THE COURT: Well, I don't have a shaded area, but ---

MS. CARON: The shading is only on my copy.

MR. GORDON: Oh, that's only your copy. Okay. Sorry.

THE COURT: Is this June 26 at 5:16 p.m.?

THE WITNESS: Yes.

THE COURT: Okay. I have it.

MR. BANTER: Your Honor, I'd like to make the objection that this is the same paragraph that we went through earlier with Mr. Ratcliffe that we instructed Mr. Ratcliffe not to read it aloud because this is -- we're, basically, claiming

attorney-client privilege and, also, hearsay.

MR. GORDON: Now I am going to authenticate it and have it admitted because it's been brought up in discussion this exact point and he's the one who was involved. That email was to him.

THE COURT: I mean, Mr. Jones opened the door as wide as -- the hinges broke off when he opened it.

MR. JONES: Your Honor, I disagree. I asked this witness respectfully what his thinking was and why he made a decision to include that on the schedules. I didn't mention anything about conversations he had with anybody else and, specifically, I didn't ask about this email.

THE COURT: But his answer --

MR. GORDON: Yeah.

THE COURT: -- which you invited discussed his discussion with Judith about why it was appropriate to do it. So I feel like the door is wide open on this -- on adding this asset to these schedules and so I mean ---

MR. JONES: Your Honor, I did not open the door with respect to attorney-client privileged information including this email. I just asked him what his understanding was of why he did it. My question to this witness was -- and I respect where the Court is coming from. I certainly do and I understand that concern, but what I asked this witness was why he did something, why he made the decision, not about

discussions that he had with anybody else.

MR. GORDON: Well, but the question was inviting him to explain how he reached his conclusion about this which is exactly what this email addresses and the email is addressed to him, and so I don't know what attorney-client privilege they're even talking about because it is to the debtor's attorney and it was turned over to the Trustee and I have every right to inquire into this now and have Mr. Hill authenticate that email. It came from his records.

MR. JONES: Your Honor ---

THE COURT: Well, who do you contend the email is from? It looks like it's -- the top part is from Jud. I realize these things go in reverse order. So I guess you start at the bottom. So Judy -- is she ghirsch3@comcast.net?

MR. GORDON: I'm going to -- Mr. Hill is the ---

THE COURT: Mr. Hill?

MR. GORDON: -- witness on this.

THE COURT: Is that her?

THE WITNESS: That's my understanding, yes.

THE COURT: All right. So on Monday, June 26 at 5:03 p.m. she's sending you an email which concludes, "Never a dull moment," and then you respond and then she sends you a second one at 5:13 "For the record" and discloses that discussion and then you close it out at 5:16, "Got it. Thanks," et cetera. So those go in reverse order; right?

THE WITNESS: Yes.

MR. GORDON: And I might observe, Your Honor, you know that it's not a privileged communication that starts out "for the record." This is not how you start out a communication that you consider to be privileged anyhow, but, Mr. Hill, do you remember that ---

MR. BANTER: Your Honor, I'm sorry. I just want to make sure our objection is heard. I think our objection is similar to his, but it is a little different. I think it is for two reasons.

THE COURT: Yes, sir?

MR. BANTER: First, we've heard testimony that Mrs. Judy Hirsch was emailing Mr. Jud Hirsch [sic] about Greg Hirsch -- excuse me, Jud Hill -- about Greg Hirsch's assets of his estate. That's what I believe some of the testimony -- what this email purports to be about or could be about is Greg Hirsch's estate which would be a different attorney-client privilege that Greg Hirsch would hold with Mr. Jud Hill. Second, this is hearsay within hearsay, Your Honor. This is an email offered for the truth of the matter asserted. At this point that's what it appears it has to be asserted and Mr. Hill is not the author of this email.

THE COURT: Well, I haven't heard the first thing to suggest an attorney-client relationship between Mr. Hill and Mr. Hirsch. You are the first person to suggest that. So, I

overrule the objection as it relates to that.

Q Have you had chance to refresh your recollection with that email, Mr. Hill?

A Yes.

Q And was that relating to the very 5-million-dollar life insurance policy that was originally scheduled with an equitable interest in the bankruptcy estate?

A Yes.

Q And did you interpret that to be a clarification that there were actually two policies and one that was going to MLG was, in fact, the 5-million-dollar policy?

A Yes.

Q Very good. And ---

A Well, I mean, the email says what it says.

Q I agree.

A I don't know that there is a lot of room for interpretation in it, but I'll leave what "going to" means to ---

Q I just want you to authenticate that that email actually happened. You received it. It was a document in your office that you turned over to the Trustee.

A Yes.

MR. GORDON: That's really what I was trying to do, Your Honor, and I would ask that it be admitted now into the record since the objections have been overruled.

THE COURT: Any further objections to -- what are we

calling this?

MR. GORDON: T-4.

THE COURT: T-4, page -- well, I'd like this page given its own number -- T-4A or something because we're not admitting the rest of it; right?

MR. GORDON: I don't think we've addressed the rest of it. So why don't we just consider T-4 to be that one page? We'll call it T-4A if that is suitable, Your Honor.

MR. JONES: Your Honor, I would like to follow up the Court's suggestion and just say that this should be recopied and remarked for the record.

THE COURT: Pardon me?

MR. JONES: I would like to follow up on the Court's suggestion and that is to the extent that this document is going to be used that it would just be separated out and just provide one -- just a single page.

THE COURT: That's my preference.

MR. JONES: Exactly.

THE COURT: The single page.

MR. JONES: I was adopting Your Honor's preference.

MR. GORDON: T-4A is what it is being called now.

MR. JONES: May I see it?

MR. GORDON: This one page will be T-4A. It's already part of the T-4 that was admitted for the limited purposes earlier.

THE COURT: Right.

MR. GORDON: I feel like I have to make this "A".

THE COURT: T-4A is admitted over objection and it's separate from T-4 and I don't recall the status of that, but while I'm thinking of exhibits, Ms. Bonanni, are you collecting all the original exhibits so I don't have to worry about getting these copies from counsel?

THE CLERK: Yes, sir.

THE COURT: All right. And you're on top of your exhibit list admitted? Okay.

(Trustee's Exhibit No. T-4A is entered into evidence.)

THE COURT: Go ahead, Mr. Gordon.

Q And I just want to be clear that in this now marked T-4A. Sorry for the little smudge there. There are actually three emails on that page and I want to be sure that you're authenticating that those are all emails that you received and were part of the email chain that you turned over to the Trustee?

A There is an a email to me from presumably Mrs. Hirsch on June 26, 2023 at 5:03. There is another email from her ten minutes later on the same date and then a response from me three minutes after that.

MR. GORDON: Thank you.

I don't have any more questions for Mr. Hill, Your Honor.

THE COURT: All right. Any other questions, counsel?

MR. BANTER: I don't have any, Your Honor.

MR. JONES: No, Your Honor.

THE COURT: All right. Thank y'all.

Mr. Hill, thank you for your time. I apologize for keeping you here all day.

MR. GORDON: Thank you, Mr. Hill.

THE COURT: All right. I am going to take the motion for turnover under advisement. I'll just give counsel my general impressions. Notwithstanding Mr. Hill's very polite and diplomatic efforts to maybe offer some protection to Mrs. Hirsch, I'm not at all convinced there is an attorney-client relationship between him and either Mrs. Hirsch, Mrs. Hirsch in her representative capacity for Mr. Hirsch, or Mr. Hirsch, and so my inclination is going to be to grant that motion, but I am going to take it under advisement and study the attorney-client relationship issue a little more closely.

I mean, as I said, his acknowledgments that, yeah, maybe I crossed the line without any specific idea of what advice he might have given her gives me pause, but, on the other hand, nothing is more sacred than the attorney-client privilege so I want to make sure I get it right.

So, counsel can brief the Court on that question.

MR. GORDON: Before we conclude on this I just want to

be sure since the position has been asserted that whether there is an attorney-client privilege is from the perspective of the client. So we were expecting Judy Hirsch, the client, to be here to explain why she believed there was an attorney-client privilege and I just want to sound out and see if she's in the courtroom and can be cross examined.

Is she here? No.

THE COURT: Is she?

MR. JONES: No, Your Honor.

THE COURT: Okay.

MR. JONES: Mr. Gordon is correct. She's not here. I would say that the basis for formation of an attorney-client relationship does not require written agreement, but if the client has a reasonable expectation that there's been a relationship formed, that's enough. That can be in the brief and the Court has already indicated that the Court didn't think there was enough, but we can address that later and ---

THE COURT: I would invite a brief on that narrow issue. I mean --

MR. JONES: Yes, Your Honor.

THE COURT: -- once we reach that, then, you know, the documents should flow freely, quickly, efficiently at minimal expense to all parties.

MR. JONES: Your Honor, we understand that and it's getting very late, but I did want to raise one other issue

that --

THE COURT: Yes, sir.

MR. JONES: -- that we would probably put in the brief and so ---

THE COURT: I am not sure where our microphones are, Mr. Jones.

MR. JONES: Thank you, Your Honor. I appreciate the reminder. It is getting late. The first letter from Ms. Caron, the Chapter 7 Trustee, which was just admitted as T-1 makes it clear that the Trustee is only requesting the waiver of the documents for pre-petition communications and here is the quote: "The Trustee of a corporation has the power to waive the corporation's attorney-client privilege with respect to pre-bankruptcy communications." And then in T-1 the Trustee cites Commodity Futures Trading versus Weintraub which is that 1985 U.S. Supreme Court decision which is controlling on all of us, really, and in that case the U.S. Supreme Court clearly held that the pre-petition communications are subject to the Trustee's waiver and that's the holding, and so we think that's why the Trustee requested that. The Trustee has since then expanded the scope of the request for communications -- attorney-client communications -- between Mr. Hill and the debtor and so ---

THE COURT: In her motion.

MR. JONES: In her motion, correct -- and so

pretermitting the issue of whether Mrs. Hirsch either acting in her own capacity or as the holder of the power of attorney for Greg Hirsch had a reasonable expectation that she was receiving legal advice from Mr. Hill and we fully respect everything that Mr. Hill testified to and we fully respect the Court's response to that, but without -- you know, setting all that aside, there is no question that Mr. Hill represented the company and there is no question that at this point per her motion the Trustee is asking for post-petition communications and, you know, I've got a couple of cases I can cite to the Court that we'll put in the brief, but, in essence, here's the issue: The Trustee is taking the position on two of the motions here that make it difficult, if not impossible, for a person in Mr. Hill's position who represents a company filing Chapter 7 because, in essence, what the Trustee is saying is is that in the pleadings that there was no ability to amend the schedules and I would cite to the Court the case of -- the case of In Re: Taj Graphics at 602 BR 351, Bankruptcy Eastern District of Michigan, 2'19.

THE COURT: Say that again.

MR. JONES: Yes, Your Honor. Taj -- T-A-J -- Graphics. It is 602 BR 351 and this is a case from the Bankruptcy Court for the Eastern District of Michigan from 2019 and it says, "It is unclear whether the court has authority to strike a debtor's amended schedules or amended statement of

financial affairs based on the alleged grounds that they are false or even fraudulent," and so I am going to read that again, but this is totally consistent with the comments from the Court at the outset today which is, you know, what -- fully dependent upon Federal Rule of Bankruptcy Proceeding 1009A and that rule says, "A debtor may amend its schedules and statement of financial affairs" -- and I am reading from the court. I am reading from this case. "A debtor may" -- and it is also reading from the statute. "A debtor may amend its schedules and statement of financial affairs as a matter of course at any time before the case is closed. The debtor retains the right to amend the Chapter 11 amend after the Chapter 11 Trustee was appointed and after the case was converted to Chapter 7."

So I repeat the company -- the entity debtor retained the right to amend the schedules after a Trustee is appointed and the Trustee is arguing today that that man couldn't amend the schedules and as the Court has already said if that man can't amend the schedules, nobody can, and that is an anomaly under the code which does not exist, and I have never seen a Chapter 7 Trustee say that a debtor, whether it's an individual or an entity, cannot amend the schedules. I mean, you know, so the Trustee, in essence -- the position they're taking today is this 7 debtor was stuck with whatever it said on the petition date and that is not the law and it cannot be the law.

Aside from that, the other problem with the position

that that Trustee is taking in this case is -- well, you can't amend the schedules because nobody can do it. Well, that's just not true under Georgia law because the operating agreement which the Trustee herself introduced into evidence today shows that Greg Hirsch is the sole member of the company and the cases cited by the counsel for the administrator show that the administrator steps into the shoes of Mr. Hirsch. So he can sign it.

There doesn't even -- if you look at the Operating Agreement it doesn't even require a resolution of anything like that. So the administrator can amend the schedules. They have a right to do it. Okay. And why am I talking about this? Because that's step one, but step number two is the position that the Trustee takes is that when this shell of a debtor -- and that's what we got here because we all understand that this woman -- the Chapter 7 Trustee -- controls the hard assets and she controls the pre-petition privilege. So if that's the case and we know that an entity debtor can amend the schedules as a matter of right per the bankruptcy rules, the position that the Trustee takes in this case is this man cannot have any privileged communications with his client about amending the schedules. Okay.

And I am just going to read -- I am going to -- to use Eric Brunstad's example for a couple of years ago at SBLI, let's try to unpack this. You unpack it. So the Trustee

controls the privilege. So she tells him in the first letter, "Give me all your pre-petition communications," and he did it, really. She's got it. That's why they got it. And then they later come back and say, "Give us all your post-petition communications." Well, if they can do that, then whoever files the corporate 7 -- I mean, how do you amend the schedules and have a privilege?

So any discussion you have -- forget about emails. You know, if you go and say don't send me an email and the client comes in your office and you have to understand everybody's recollection of everything you say is subject to this man asking you every word that was said in a meeting, that's not fair and it cannot be right and there's two cases that talk about that. They're both -- I will say this upfront. They're both individual debtors. So they're distinguishable on that part. They're individual debtors, but I would cite to the court In Re: Eddy -- E-D-D-Y. That's the Bankruptcy Court from the District of Massachusetts at 304 BR 591 and that's from 2004 and they don't hit this square on point, but, basically, they talk about they follow -- they acknowledge the Weintraub decision by the Supreme Court.

It makes a distinction between communications between a debtor in possession and a debtor. Okay? And that's what this case does and the -- and the same with this. And here's why. Here's why it makes sense to look about -- to think about

when the privilege vests with the Trustee. It vests when the Trustee becomes the Trustee, but after the Trustee becomes the Trustee what does this man represent? A shell because the Trustee controls all the assets and the privilege.

So, really, what is the role of a Chapter 7 entity lawyer after the 7 is filed? Show up for the 341. Amend the schedules as necessary, but you have to have a privilege and the reason that the privilege is fixed when the Trustee is appointed is because at that point the Trustee has the assets, has the privilege, and she can hire her own lawyer and have her own privileged communications with her lawyer. Okay?

So where does that leave this man? He's reporting to this person because if he can't report to this person, he has nobody to report to. So the end result of what the Trustee wants to happen in this case is an empty chair. They want a debtor like that and I would submit that is not the right result.

I'll give another example of why it should end up like that. Okay. Say you start out an 11. Okay. We all know that a corporate entity -- let's just call it a company -- files an 11 and has a lawyer. We all know that the lawyer representing the company has to be disinterested in that lawyer and the principals of the debtor have a fiduciary duty to creditors in a bankruptcy case. So while the attorney is representing the company in Chapter 11, anything that happens is subject -- and

then the case gets converted. Anything prior to the conversion to a 7 is subject to the waiver of the privilege. No doubt about it.

So the Trustee -- so let's just take the hypothetical. You file an 11, convert it to 7. The Trustee comes and says, "Mr. Hill, you filed a Chapter 11. Okay. I want every email that you wrote leading up to the Chapter 11 and I want to see every email that you wrote before the case was converted." And guess what? This lawyer says, "Fine," you know, other than what's privileged and what's not unless there is two or three clients, the court -- so, assume we've got a simple hypothetical. A debtor -- and the reason is because the lawyer and the principals of the debtor have a fiduciary duty to creditors during that -- because presumably, and I think this is what the Supreme Court said in Weintraub, you know, companies in the zone of insolvency, they have a duty to creditors and they should expect that the privilege could be waived.

So the point is pre-petition, pre-conversion the Trustee gets the records, but after conversion and the Trustee is appointed the lawyer that represented the debtor has nothing but a shell and they have to be able to report to somebody free of any claim of a waiver of a privilege so they can do things like amend the schedules. Thank you, Your Honor.

MR. GORDON: I wasn't expecting that we were jumping

into these closing arguments, but I am fine with that, Your Honor.

MR. JONES: I apologize.

I apologize to the Court.

MR. GORDON: I'll be a lot shorter and less impassioned than Mr. Jones, my good friend from Atlanta. First of all, any time you try to make parallels between an individual debtor case and a corporate case it is inapposite. I mean, it is completely wrong. The attorney-client privilege isn't automatically waivable anyhow in an individual case. It is a case-by-case basis. In corporate it is not a case-by-case basis. It is automatic.

Weintraub -- the Supreme Court said that the only person who holds the privilege is the Trustee because that's the only person you can still identify in an insolvent situation as acting in the nature of the directors -- what the directors and officers of the company would do and so that's why the Trustee is the one that holds the privilege because she is the company and she's entitled to the documents and records and she did originally demand the pre-petition documents and later the post-petition documents.

Nobody -- nobody except for Mr. Hill responded to the motion for turnover. He filed a response. Nobody else did. Nobody filed a response or an objection or anything going into this on the motion to strike, and I am, again, going to explain

and unlike everybody else we already briefed the issue and on pages nine and ten, Document No. 140 -- and that is the motion that we filed for turnover, pages nine and ten -- we're citing the cases where it is held that the Trustee's power is as to both pre-petition and post-petition communications.

I don't have to give you the cites because they're already in our brief and the -- and there are other cites there explaining that upon conversion from 11 to 7 then what happened during the 11 is also subject to the waiver and aside from the fact that that is the clear authority and I'm giving this in an impassioned way because it's just -- I've dealt with it a lot of times -- but the reality is this case is just a really difficult, different case. There is nobody in the chair anyhow.

Mr. Jones keeps saying the chair is empty. Well, the chair is empty, Your Honor. Greg Hirsch died. Judy Hirsch's power of attorney expired upon his death. There is no -- and she probably didn't know much from what we're told about the company anyhow, but there is nobody that knows anything about the company. The person that knows the most about it is the Trustee. It is like these involuntary cases where you don't have anybody that wants to be there and nobody is willing to do anything. Even if you try to designate, you can't get anything done, and the Trustee like Mr. Hays has done is directed and agrees to prepare the statements and schedules after ferreting

through the books and records and becoming the person most knowledgeable about it.

There is nobody in the chair, and, certainly, Mr. Ratcliffe can't be in the chair because if you read that in at least six different paragraphs of the Operating Agreement if he is doing his job for Greg Hirsch he is violating his job as the fiduciary to MLG. I mean, he just is so conflicted and I realize he said he's fixing to do this, he is fixing to do that, but he is so conflicted. This is a very unusual case and I thought we'd finished arguing the motion to strike, but we're back at it.

The Trustee is willing to perform the role because she's the only one who is accessing all the books and records as best they can be obtained. So this isn't just that we have an empty chair. We don't have books and records. This was a CPA whose done his best to make it very confusing because every accountant I have ever known were meticulous in their personal recordkeeping and where are all the records? We don't know.

They object to the motion for turnover. They assert attorney-client privilege, but they don't produce the only witness that could back that up. She didn't come to court and so they're trying to get it through cross examination of Mr. Hill and they didn't get anywhere close to being able to establish that. There is one engagement agreement signed and that's with the company and there is no engagement agreement

ever signed with her, nor did he ever invoice her for any legal advice. It just didn't happen.

So the documents are subject to turnover and as the cases hold that the privilege as to both pre-petition and post-petition communications. This is -- this is a follow-up of what -- and it's true that in some cases there is only the issue. You are only discussing pre-petition. You're not discussing post-petition and it's not covered, but in cases where it's covered they are finding that the Trustee still has that privilege. It is even more important in a case where there is an empty chair, but, rightfully, wrongfully, these amendments are getting filed and somebody is communicating with the attorney for the debtor, the soon-to-be former attorney.

Somebody is communicating. We're entitled to know who is communicating and what is going on because the chair is empty. Where is this information coming from? Who is directing this ship that's not putting their name on anything? Why aren't we entitled to know that? We absolutely are entitled to know that. You look at those amendments. You're not going to see anybody's name. We were already told that Judy Hirsch -- I think Mr. Jones asked the question. Judy Hirsch did not give the direction for those amendments, did not sign those amendments. Somebody did. Who? Who was giving -- who is running this case? Why isn't the Trustee entitled to know that?

In this -- the facts of this case she's absolutely entitled to post-petition as well as pre-petition. We don't know where the information is even coming from. There is no person that you have to worry about confidential information going back and forth according to what we've heard. Nothing. There isn't anybody in the chair. It's empty. But somebody is giving orders and we don't know who it is. We suspect we know and we're going to know once the attorney-client privilege is considered waived and turnover awarded for the post-petition records, too. Then we're going to find out what they've been trying so hard to protect.

All these attorneys spending all this money on what I consider pretty basic issues in the context of this case and it must be pretty damning and the Trustee is entitled to get that information. I mean, the people could have come in to court themselves and they could have protested and said, "Oh, this is my lawyer who gave me all this advice. He did this and that." Where is that evidence? Where is that testimony? Didn't happen. Didn't happen. All we have is that, "No, I didn't represent her. I am sorry she got that impression, but, no, I didn't represent her. I never charged her for anything. I never did this. I never did that," and we have looked as Your Honor did at the time records and the first several meetings before Mr. Hill ever met with Mrs. Hirsch was with her personal attorney. She had personal counsel the whole time.

So there is just no way that you can reasonably take the position that, oh, you're my attorney. It just can't be done and, you know, for these reasons -- and we're happy -- I mean, we've already briefed it. We're happy to wait for their brief and then do a reply.

THE COURT: Mr. Gordon, maybe you can help me remember something. Years ago Kathy Horne, a local lawyer, had a case ---

MR. GORDON: Great lawyer.

THE COURT: Yes. And I think she had been representing the debtor in a Chapter 11 and, you know, and incurred time and had an application for compensation and then for some reason when it converted to 7 she did a lot of work and sought compensation for that and I believe the Eleventh Circuit said, no, a debtor can never be -- a debtor who wasn't hired by the Trustee can never be paid by the estate in a 7.

MR. GORDON: Supreme Court case. The Laney case.

THE COURT: Okay. And Mr. Jones' argument about how impossible it would be for Mr. Hill to advise the debtor, it occurs to me that that sort of bright line exists for another reason. I'm trying to figure out what confidential communication could occur post-appointment of Ms. Caron, post-petition, between a shell corporation and that lawyer, Mr. Hill. I mean, it has to act through a person. So that person, you know, if they're giving some secrets, they're not

giving away secrets of the debtor. They're giving away their own secrets.

In other words, they don't have -- I'm trying to work through his example and convince myself it's incorrect and I'm not sure I'm there yet. It sounded really good when he said, "Who is Mr. Hill supposed to talk to?" Is everything he says after, you know, the -- after the Trustee is appointed just open to discussion and it seems to me that where the debtor is an individual Mr. Hill -- I mean, Mr. Jones is right.

MR. GORDON: Absolutely.

THE COURT: You could never compel the debtor's lawyer ---

MR. GORDON: Absolutely right from the individual case except in special circumstances, that's absolutely ---

THE COURT: Because often the debtor is an adversary with the Trustee. They get sued for, you know, fraudulent conveyances.

MR. GORDON: There are discharge issues.

THE COURT: Obviously ---

MR. GORDON: Particularly discharge issues. You know, that's even worse.

THE COURT: That privilege stays with an individual.

MR. GORDON: Right.

THE COURT: But with a corporate debtor, basically, once it's a debtor it doesn't really have any -- I am trying to

almost say it doesn't have any justification for, you know, seeking that privileged communication because all of that information belongs to the Trustee -- anyway, I am just -- I'm thinking out loud and making myself sound stupid, but I want Mr. Jones to know that his argument caught my attention. He cited me to the case of Eddy. I am going to look that up. And as I said before, nothing is more sacred, I think, to lawyers than the attorney-client privilege and I want to get this right. Okay.

So have you said your peace?

MR. GORDON: Yes, Your Honor. Just to say that, you know, if somebody is acting as the fiduciary anonymously, the Trustee is absolutely entitled to know who is doing it and why.

THE COURT: Well, I mean, who would benefit from those actions? I mean, that's the simple answer. It seems pretty obvious to me, but, anyway. All right. Anything else on the calendar that counsel wants to take up?

MR. GORDON: I believe that was the last item. Unless Joel ---

THE COURT: All right. So I've taken under advisement the motion to strike and the motion to turn over which implicates the attorney-client privilege. I invite briefs on any and all issues that we've talked about today. I appreciate everybody's participation. We'll be adjourned.

(End of Transcript of Record.)

CERTIFICATE OF OFFICIAL REPORTER

I, Lisa H. Davenport, Federal Official Court Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of record of the digitally-recorded proceedings to the best of my ability and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Digitally signed by 1cd1fa85-0504-4e11-9b4c-90a3d63c1e39
Date: 2025.01.25 11:53:06 -05'00'

___________________________________

Lisa H. Davenport, RPR, FCRR
Federal Official Court Reporter